QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Sean S. Pak (Bar No. 219032)
seanpak@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Attorneys for Plaintiffs MediaTek Inc. and
MediaTek USA Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEDIATEK INC. and MEDIATEK USA INC., | CASE NO. |
| Plaintiffs, | **COMPLAINT FOR PATENT INFRINGEMENT** |
| v. | **JURY TRIAL DEMANDED** |
| NXP SEMICONDUCTORS N.V., NXP USA, INC., AVNET, INC., ARROW ELECTRONICS, INC., DENSO TEN LIMITED, DENSO TEN AMERICA LIMITED, ROBERT BOSCH GMBH, ROBERT BOSCH LLC, CONTINENTAL AG, and CONTINENTAL AUTOMOTIVE GMBH, | |
| Defendants. | |

Plaintiffs MediaTek Inc. and MediaTek USA Inc. ("MediaTek" or "Plaintiffs"), by and through their undersigned counsel, complain and allege against NXP Semiconductors N.V. and NXP USA, Inc. (collectively, "NXP"), Avnet, Inc. ("Avnet"), Arrow Electronics, Inc. ("Arrow"), Denso Ten Limited and Denso Ten America Limited (collectively, "Denso"), Robert Bosch GmbH and Robert Bosch LLC (collectively, "Bosch"), and Continental AG and Continental Automotive GmbH (collectively, "Continental") (collectively, "Defendants") as follows:

## NATURE OF THE ACTION

1.    This is a civil action for infringement of U.S. Patent No. 6,738,845 (the "'845 patent"), U.S. Patent No. 6,823,451 (the "'451 patent"), U.S. Patent No. 8,464,037 (the "'037 patent"), U.S. Patent No. 9,265,056, (the "'056 patent"), U.S. Patent No. 9,538,531 (the "'531 patent"), and U.S. Patent No. 10,211,948 (the "'948 patent") (collectively, "the Asserted Patents") arising under the patent laws of the United States, 35 U.S.C. §§ 1 et seq.

## THE PARTIES

2.    MediaTek Inc. is a corporation incorporated in 1997 under the laws of Taiwan (Republic of China) and publicly traded on the Taiwan Stock Exchange (TSEC) since 2001, with its principal place of business located at No. 1, Dusing Road 1, Hsinchu Science Park, Hsinchu City 30078, Taiwan.  MediaTek Inc. was founded on May 28, 1997 and has been headquartered since its founding in the Hsinchu Science Park, located in Hsinchu, Taiwan.

3.    MediaTek USA Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 2840 Junction Avenue, San Jose, California, 95134 and other locations in Texas, New Jersey, Washington, California, and Massachusetts.  MediaTek USA Inc. was established in 1997 and is a wholly-owned subsidiary of MediaTek Inc.

4.    For more than 20 years, MediaTek has been in the business of researching, designing, developing, and selling innovative semiconductor and

cellular technologies and products for the telecommunications and mobile industries, as well as entertainment industries involving HDTV, DVD and Blu-ray products.

5.      Today, MediaTek is one of the world's leading fabless semiconductor companies and a market leader in developing cutting-edge systems-on-chip (SoC) technology for a wide range of applications, such as highly power-efficient mobile technologies, automotive solutions, and a broad range of advanced multimedia products such as smartphones, tablets, digital televisions, 5G, Voice Assistant Devices (VAD), wearables, connectivity products, and IoT products.  Its SoC technologies enable more than 2 billion consumer electronic products a year.

6.      Since its founding, MediaTek has invested billions of dollars in research and development related to cutting-edge technologies.  In 2016, MediaTek committed to allocate $6.7 billion in research and development spending over the next five years.  In 2018, MediaTek increased the number by up to $3.3 billion to secure growth opportunities in artificial intelligence computing and the fifth generation, or 5G, wireless communication era.[1]  In 2020, MediaTek spent about $2.7 billion in research and development related activities.  MediaTek recently committed to invest around $3 billion in research and development in various fields in 2021.  This annual research and development budget sets a new record for the company.[2]  Because of this ongoing investment, MediaTek continues to drive the development and commercialization of successive generations of various technologies.

7.      MediaTek's innovations have resulted in numerous industry accolades.

---

[1]  *See* https://asia.nikkei.com/Business/Companies/MediaTek-boosts-R-D-spend-by-up-to-3.3bn-to-secure-growth.

[2]  *See* https://www.gizmochina.com/2021/01/28/mediatek-3-billion-research-2021/

8.     For example, in 2019, MediaTek was selected as the winner of the "IoT Semiconductor Company of the Year," as awarded by IoT Breakthrough.

9.     MediaTek received the Editor's Choice award as the "Best Gaming Phone Chipset Maker of 2020" at the 7th Mobility Conclave and Excellence Awards Night of 2021.

10.    In 2019, the MediaTek 5G SoC—the world's first 7nm mobile chipset with a fully integrated 5G modem—was honored as the "Best Mobile Chipset" by GadgetMatch at Computex.

11.    MediaTek's Helio P90 SoC won first place in the Artificial Intelligence Chipset category for Embedded Vision's Product of the Year Awards in 2019.

12.    In 2021, MediaTek's Dimensity 1000 was honored as the "Digital Semiconductor Product of the Year" at the 2020 Elektra Awards.

13.    On information and belief, NXP Semiconductors N.V. is a public corporation organized and existing under the laws of the Netherlands, and maintains its principal place of business at High Tech Campus 60, 5656 AG Eindhoven, Netherlands.

14.    On information and belief, NXP USA, Inc. is a corporation organized and existing under the laws of the State of Delaware, and maintains its principal place of business at 6501 W. William Cannon Dr., Austin, TX 78735.    On information and belief, NXP USA, Inc. is a wholly-owned subsidiary of NXP Semiconductors N.V.

15.    On information and belief, Avnet is a public corporation organized and existing under the laws of the State of New York, and maintains its principal place of business at 2211 South 47th Street, Phoenix, AZ 85034.

16.    On information and belief, Arrow is a public corporation organized and existing under the laws of the State of New York, and maintains its principal place of business at 9201 East Dry Creek Road, Centennial, CO 80112.

17.     On information and belief, Robert Bosch GmbH is a company organized and existing under the laws of Germany, and maintains its principal place of business at Robert-Bosch-Platz 1, 70839 Gerlingen-Schillerhöhe, Germany.

18.     On information and belief, Robert Bosch LLC is a company organized and existing under the laws of the State of Delaware, and maintains its principal place of business at 38000 Hills Tech Drive, Farmington Hills, MI 48331.   On information and belief, Robert Bosch LLC is a wholly owned subsidiary of Robert Bosch GmbH.

19.     On information and belief, Denso Ten Limited is a company organized and existing under the laws of Japan, and maintains its principal place of business at 2-28, Gosho-dori 1-chome, Hyogo-ku, Kobe, Kyogo, Japan 652-8510.

20.     On information and belief, Denso Ten America Limited is a company organized and existing under the laws of the State of California, and maintains its principal place of business at 30155 Hudson Drive, Novi, MI 48377.  On information and belief, Denso Ten America Limited is a wholly-owned subsidiary of Denso Ten Limited.

21.     On information and belief, Continental AG is a company organized and existing under the laws of Germany, and maintains its principal place of business at Vahrenwalder Strasse 9, 30165 Hanover, Germany.

22.     On information and belief, Continental Automotive GmbH is a company organized and existing under the laws of Germany, and maintains its principal place of business at Vahrenwalder Strasse 9, 30165 Hanover, Germany.  On information and belief, Continental Automotive GmbH is a wholly-owned subsidiary of Continental AG.

## **JURISDICTION AND VENUE**

23.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

COMPLAINT

1

## NXP

2      24.    Venue in this District is proper under 28 U.S.C. § 1391 and 28 U.S.C. §
3 1400(b) with respect to NXP.  On information and belief, NXP Semiconductor N.V.
4 and NXP USA, Inc. have committed acts of infringement in this District, directly
5 and/or through intermediaries, by, among other things, making, using, offering to
6 sell, selling, and/or importing products and/or services that infringe the Asserted
7 Patents, as alleged herein.  NXP Semiconductor N.V. is a foreign corporation and
8 venue is proper as to a foreign defendant in any district.  NXP USA, Inc. has a
9 regular and established place of business in this District.  NXP USA, Inc. maintains
10 corporate offices in this District, including at 6410 Oak Canyon, Suite 200, Irvine,
11 CA 92618.

12      25.    This Court has personal jurisdiction over NXP Semiconductor N.V. and
13 NXP USA, Inc.  On information and belief, all entities have conducted and continue
14 to conduct business in the State of California, including in the Central District of
15 California.  Further, all entities, directly and through subsidiaries and intermediaries
16 (including distributors, retailers, franchisees and others), have committed and
17 continue to commit acts of patent infringement and/or contributed to or induced acts
18 of patent infringement by others in this District and elsewhere in California and the
19 United States.  As such, all entities have purposefully availed themselves of the
20 privilege of conducting business within this District; have established sufficient
21 minimum contacts with this District such that they should reasonably and fairly
22 anticipate being haled into court in this District; have purposefully directed activities
23 at residents of this State; and at least a portion of the patent infringement claims
24 alleged herein arise out of or are related to one or more of the foregoing activities.

25

26

27

28

COMPLAINT

26.     For example, NXP established an office in Irvine, CA.[3]  NXP employs sales employees, wireless system engineers, test engineers, and account managers at this office.[4]  It posts listings for these positions on its website at http://www.nxp.com. NXP has provided live demonstrations of its products at trade shows in this District, including at Mobile World Congress Los Angeles 2019.[5]  NXP reported roughly $ 750 million in revenue in the United States in 2020.[6]

**Avnet**

27.     Venue in this District is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1400(b) with respect to Avnet.  On information and belief, Avnet has committed acts of infringement in this District, directly and/or through intermediaries, by, among other things, making, using, offering to sell, selling, and/or importing products and/or services that infringe the Asserted Patents, as alleged herein.  Avnet has a regular and established place of business in this District.  Avnet maintains corporate offices in this District, including at 20951 Burbank Blvd, Woodland Hills, CA 91367, and 220 Commerce #100, Irvine, CA 92602.

28.     This Court has personal jurisdiction over Avnet.  On information and belief, Avnet has conducted and continues to conduct business in the State of California, including in the Central District of California.  Further, Avnet, directly and through subsidiaries and intermediaries (including distributors, retailers, franchisees and others), has committed and continues to commit acts of patent infringement and/or contributed to or induced acts of patent infringement by others

---

[3]   https://www.nxp.com/company/about-nxp/worldwide-locations/united-states:USA

[4]   https://nxp.wd3.myworkdayjobs.com/careers

[5]   https://investors.nxp.com/news-releases/news-release-details/nxp-debuts-new-series-programmable-baseband-processors-5g-access

[6]   https://investors.nxp.com/static-files/04cb200b-d030-440d-a9e0-40f245ab0f90, at 108

COMPLAINT

in this District and elsewhere in California and the United States.  As such, Avnet has purposefully availed itself of the privilege of conducting business within this District; has established sufficient minimum contacts with this District such that it should reasonably and fairly anticipate being haled into court in this District; has purposefully directed activities at residents of this State; and at least a portion of the patent infringement claims alleged herein arise out of or are related to one or more of the foregoing activities.

**Arrow**

29.    Venue in this District is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1400(b) with respect to Arrow.  On information and belief, Arrow has committed acts of infringement in this District, directly and/or through intermediaries, by, among other things, making, using, offering to sell, selling, and/or importing products and/or services that infringe the Asserted Patents, as alleged herein.  Arrow has a regular and established place of business in this District.  Arrow maintains corporate offices in this District, including at 26632 Towne Centre Dr., Suite 100, Foothill Ranch, CA 92610, and 20935 Warner Center Lane, Woodland Hills, CA 91367.

30.    This Court has personal jurisdiction over Arrow.  On information and belief, Arrow has conducted and continues to conduct business in the State of California, including in the Central District of California.  Further, Arrow, directly and through subsidiaries and intermediaries (including distributors, retailers, franchisees and others), has committed and continues to commit acts of patent infringement and/or contributed to or induced acts of patent infringement by others in this District and elsewhere in California and the United States.  As such, Arrow has purposefully availed itself of the privilege of conducting business within this District; has established sufficient minimum contacts with this District such that it should reasonably and fairly anticipate being haled into court in this District; has purposefully directed activities at residents of this State; and at least a portion of the

1 patent infringement claims alleged herein arise out of or are related to one or more of
2 the foregoing activities.

3                                          **Bosch**

4        31.     Venue in this District is proper under 28 U.S.C. § 1391 and 28 U.S.C. §
5 1400(b) with respect to Bosch.  On information and belief, Robert Bosch GmbH and
6 Robert Bosch LLC have committed acts of infringement in this District, directly
7 and/or through intermediaries, by, among other things, making, using, offering to
8 sell, selling, and/or importing products and/or services that infringe the Asserted
9 Patents, as alleged herein.  Robert Bosch GmbH is a foreign corporation and venue is
10 proper as to a foreign defendant in any district.  Robert Bosch LLC has a regular and
11 established place of business in this District.  Robert Bosch LLC maintains corporate
12 offices in this District, including at 4641 East Guasti Road, Ontario, CA 91761, and
13 1901 Main St #600, Irvine, CA 92614.

14       32.     This Court has personal jurisdiction over Robert Bosch GmbH and
15 Robert Bosch LLC.  On information and belief, all entities have conducted and
16 continue to conduct business in the State of California, including in the Central
17 District of California.  Further, all entities, directly and through subsidiaries and
18 intermediaries (including distributors, retailers, franchisees and others), have
19 committed and continue to commit acts of patent infringement and/or contributed to
20 or induced acts of patent infringement by others in this District and elsewhere in
21 California and the United States.  As such, all entities have purposefully availed
22 themselves of the privilege of conducting business within this District; have
23 established sufficient minimum contacts with this District such that they should
24 reasonably and fairly anticipate being haled into court in this District; have
25 purposefully directed activities at residents of this State; and at least a portion of the
26 patent infringement claims alleged herein arise out of or are related to one or more of
27 the foregoing activities.

28

COMPLAINT

33.    For example, Robert Bosch GmbH places its products into the stream of commerce throughout the United States, and in California in particular.    Robert Bosch GmbH, alone and through its subsidiaries, has specifically targeted the United States market.[7]   Robert Bosch's executives have traveled to automotive shows in the United States to market their automotive products.  For instance, Dr. Markus Heyn—a member of Robert Bosch GmbH's board of management—described Robert Bosch GmbH's product offerings in a press release concerning CES 2019 in Las Vegas, Nevada.[8]

**Denso**

34.    Venue in this District is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1400(b) with respect to Denso.  On information and belief, Denso Ten Limited and Denso Ten America Limited have committed acts of infringement in this District, directly and/or through intermediaries, by, among other things, making, using, offering to sell, selling, and/or importing products and/or services that infringe the Asserted Patents, as alleged herein.  Denso Ten Limited is a foreign corporation.  Venue is proper as to a foreign defendant in any district.  Denso Ten America Limited has a regular and established place of business in this District.  Denso Ten

---

[7]   https://www.bosch-presse.de/pressportal/de/en/company-page.html ("The Bosch Group comprises Robert Bosch GmbH and its roughly 440 subsidiary and regional companies in 60 countries. Including sales and service partners, Bosch's global manufacturing, engineering, and sales network covers nearly every country in the world."); https://assets.bosch.com/media/global/bosch_group/our_figures/pdf/bosch-annual-report-2019.pdf (reporting over € 10 billion in sales in the United States); https://www.bosch-presse.de/pressportal/de/media/migrated_download/de/BoschKompakt_Nordamerika-en.pdf (noting that "Bosch has been active in America for over one hundred years," that Bosch generates 20 percent of its sales in the Americas, and that the United States is the "second largest Bosch market after Germany").

[8]   https://www.autofutures.tv/2018/12/14/bosch-to-showcase-shuttle-of-the-future-at-ces-2019/

America Limited maintains corporate offices in this District, including at 20200 S Western Ave., Torrance, CA 90501.

35.    This Court has personal jurisdiction over Denso Ten Limited and Denso Ten America Limited.  On information and belief, all entities have conducted and continue to conduct business in the State of California, including in the Central District of California.  Further, all entities, directly and through subsidiaries and intermediaries (including distributors, retailers, franchisees and others), have committed and continue to commit acts of patent infringement and/or contributed to or induced acts of patent infringement by others in this District and elsewhere in California and the United States.  As such, all entities have purposefully availed themselves of the privilege of conducting business within this District; have established sufficient minimum contacts with this District such that they should reasonably and fairly anticipate being haled into court in this District; have purposefully directed activities at residents of this State; and at least a portion of the patent infringement claims alleged herein arise out of or are related to one or more of the foregoing activities.

36.    For example, Denso Ten Limited maintains an operations office for a subsidiary in Torrance, CA.  Denso Ten's website indicates that this is part of its global network of Denso Ten offices.[9]  Denso Ten Limited itself files applications for wireless products with the Federal Communications Commission, demonstrating its intention to offer products for use in the United States.[10]

**Continental**

37.    Venue in this District is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1400(b) with respect to Continental.  On information and belief, Continental AG and Continental Automotive GmbH have committed acts of infringement in this District,

---

[9]    https://www.denso-ten.com/company/outline/global_network/usa.html
[10]    https://fccid.io/BAB

COMPLAINT

1 directly and/or through intermediaries, by, among other things, making, using,
2 offering to sell, selling, and/or importing products and/or services that infringe the
3 Asserted Patents, as alleged herein.  Continental AG is a foreign corporation and
4 venue is proper as to a foreign defendant in any district.  Continental Automotive
5 GmbH is a foreign corporation and venue is proper as to a foreign defendant in any
6 district.

7        38.    This Court has personal jurisdiction over Continental AG and
8 Continental Automotive GmbH.  On information and belief, all entities have
9 conducted and continue to conduct business in the State of California, including in
10 the Central District of California.  Further, all entities, directly and through
11 subsidiaries and intermediaries (including distributors, retailers, franchisees and
12 others), have committed and continue to commit acts of patent infringement and/or
13 contributed to or induced acts of patent infringement by others in this District and
14 elsewhere in California and the United States.  As such, all entities have purposefully
15 availed themselves of the privilege of conducting business within this District; have
16 established sufficient minimum contacts with this District such that they should
17 reasonably and fairly anticipate being haled into court in this District; have
18 purposefully directed activities at residents of this State; and at least a portion of the
19 patent infringement claims alleged herein arise out of or are related to one or more of
20 the foregoing activities.

21        39.    For example, Continental AG, alone and through its subsidiaries (such
22 as Continental Automotive GmbH) places its products into the stream of commerce
23 throughout the United States, and in California in particular.  Continental AG, alone
24 and through its subsidiaries, has specifically targeted the United States market.
25 Continental's executives have traveled to automotive shows in the United States to
26 market their automotive products.  Continental AG CTO Dr. Dirk Abendroth

27

28

traveled to CES 2020 to showcase Continental's technology in the United States.[11]  A member of Continental AG's Executive Board and the head of its Interior Division, Helmut Matschi, attended at least CES 2019, CES 2018, and CES 2014 in order to demonstrate Continental's technological innovations to a United States market.[12] Further, products that Continental AG and Continental Automotive GmbH direct to the United States in general and California in particular, and which Continental AG and Continental Automotive GmbH reasonably expect will end up in the United States, bear markings indicating manufacture by Continental Automotive GmbH. Continental AG has acknowledged that its products are used in cars sold in the American market.[13]   Continental AG has an American subsidiary,  with a major office in San Jose, California, which focuses on automated driving, electromobility, connectivity and mobility services.[14]

## MEDIATEK'S ASSERTED PATENTS

40.    On May 18, 2004, the United States Patent Office issued U.S. Patent No. 6,738,845, titled "Bus architecture and shared bus arbitration method for a communication device."   A true and correct copy of the '845 patent is attached hereto as Exhibit A.  The '845 patent identifies Rainer Hadwiger, Paul Krivacek, Jørn Sørensen, and Palle Birk as inventors.

---

[11]  https://www.autofutures.tv/2020/01/07/continental-talks-transparent-hood-technology-and-autonomous-safety-at-ces/

[12]  https://www.businesswire.com/news/home/20181217005684/en/Continental-Showcases-Innovations-for-Smarter-and-Safer-Cities-at-CES-2019; https://www.continental.com/en/press/press-releases/2017-12-14-ces-2018-116376; https://www.drivingthenation.com/continentals-helmut-matschi-at-the-2014-ces/

[13]  https://www.continental.com/en/press/press-releases/advanced-driver-assistance-systems-213116

[14]  https://www.continental.com/en/press/press-releases/continental-strengthens-worldwide-technology-network-with-new-research-center-in-silicon-valley-28710

COMPLAINT

41.     On November 23, 2004, the United States Patent Office issued U.S. Patent No. 6,823,451, titled "Integrated circuit for security and manageability."  A true and correct copy of the '451 patent is attached hereto as Exhibit B.  The '451 patent identifies Dale Gulick and Geoffrey Strongin as inventors.

42.     On June 11, 2013, the United States Patent Office issued U.S. Patent No. 8.464,037, titled "Computer system comprising a secure boot mechanism on the basis of symmetric key encryption."  A true and correct copy of the '037 patent is attached hereto as Exhibit C.  The '037 patent identifies Michael Grell, Ralf Findeisen, and Frank Schuecke as inventors.

43.     On February 16, 2016, the United States Patent Office issued U.S. Patent No. 9,265,056, titled "Methods for responding to co-located coexistence (CLC) request from a mobile electronic device and communications apparatuses capable of controlling multi-radio coexistence."  A true and correct copy of the '056 patent is attached hereto as Exhibit D.  The '056 patent identifies Chi-Chen Lee, I-Kang Fu, Li-Chun Ko, Hong-Kai Hsu, Chih-Hao Yeh, and Jiun-Jang Su as inventors.

44.     On January 3, 2017, the United States Patent Office issued U.S. Patent No. 9,538,531, titled "Systems and methods for activity coordination in multi-radio terminals."  A true and correct copy of the '531 patent is attached hereto as Exhibit E.  The '531 patent identifies Li-Chun Ko, Hong-Kai Hsu, I-Kang Fu, Chi-Chen Lee as inventors.

45.     On February 19, 2019, the United States Patent Office issued U.S. Patent No. 10,211,948, titled "LDPC tone mapping schemes for dual-sub-carrier modulation in WLAN."  A true and correct copy of the '948 patent is attached hereto as Exhibit F.  The '948 patent identifies Jianhan Liu, Shengquan Hu, Tianyu Wu, and Thomas Edward Pare, Jr. as inventors.

46.     MediaTek is the owner of all right, title, and interest in and to each of the Asserted Patents with full and exclusive right to bring suit to enforce the Asserted Patents, including the right to recover for past damages and/or royalties up until the

1  expiration of the each Asserted Patent. MediaTek USA Inc. is a wholly-owned
2  subsidiary of MediaTek Inc. and has a license under the patents asserted here.

3      47.    The Asserted Patents are valid and enforceable.

4                              **BACKGROUND**

5                            **MediaTek's Patents**

6      48.    The '845 patent provides an improved bus architecture and a new bus
7  arbitration method. For example, the '845 patent discloses a device including a
8  digital signal processor (DSP) subsystem and a micro-controller unit (MCU)
9  subsystem. One bus provides an external connection to the DSP subsystem for other
10 elements of the device. Similarly, another bus provides an external connection to the
11 MCU subsystem for other elements of the device. The device further includes three
12 other buses to which various additional elements are connected. These buses are
13 interconnected through a bus arbitration module (BAM). The bus arbitration module
14 includes three arbitration units and a direct memory access (DMA) subsystem
15 including a DMA bus and a DMA controller. By having a separate arbitration unit
16 for each slave bus, the BAM is constructed and arranged to avoid blocking when
17 multiple bus masters each request access to resources connected to the different slave
18 buses.

19     49.    The '451 patent relates to an apparatus for increasing security and
20 manageability. For example, the '451 patent discloses a security hardware including
21 subdevices, such as a System Management Mode (SMM) timing controller, a SMM
22 access controller, a control logic, a TCO counter, a monotonic counter, the
23 scratchpad RAM, a random number generator, secure system (or SMM) management
24 registers, OAR—(Open At Reset) locks, and an OAR override register. The SMM
25 access controller includes one or more access locks. The access locks provide a
26 means of preventing (or locking) and allowing (or unlocking) access to one or more
27 of the devices within the security hardware. In one embodiment, the access locks are
28 open at reset (OAR), allowing the BIOS software access to the security hardware.

The BIOS software then closes the access locks prior to calling the boot sector code. In various embodiments, the access locks may be opened by software or hardware to allow for access to the security hardware. For example, the access locks may be opened by a signal from the IC or the processor or the control logic.

50.    The '037 patent relates to devices and mechanisms for enhancing the integrity of computer systems.  The '037 patent discloses establishing a static root of trust for measurement in that a certain set of data is provided that may include executable instructions and data values which, if a secure boot mechanism is enabled, will be accessed by the central processing unit without providing the possibility of circumventing access to the dedicated data set so that a defined root for the initialization of the platform is obtained.

51.    The '056 and '531 patents relate to schemes for coordinating communications between multiple radios on utilizing different communication protocols on a single terminal—a feature commonly referred to as "coexistence." For example, the '056 patent discloses a communications apparatus with a first and second radio that communicate with first and second communications devices using first and second wireless communications protocols (e.g., IEEE 802.11 and Bluetooth), respectively.  When the second radio detects that the first radio is active, the second radio determines a first set of communications traffic patterns that the first radio is using to communicate, and then generates a second set of communications traffic patterns designed to minimize interference between the two radios.  The second radio may send the second set of traffic patterns to the device with which it is communicating as recommended allocations of sub-frames for the device to use when transmitting.  The '531 patent similarly discloses a wireless communication device with a first and second radio communicating using first and second communications protocols.    The second radio of the '531 patent's wireless communication device detects the traffic patterns of the first radio and generates a set of second traffic patterns such that transmissions by the first and second radio will

1  not interfere with reception by the second and first radio, respectively.  An indicator
2  of the second traffic patterns is then sent to a peer communication device to indicate
3  the allocations to be used for communicating with the second radio.

4      52.    The '948 patent relates to schemes for LDPC tone mapping in a given
5  resource unit when dual sub-carrier modulation is applied.  It discloses a wireless
6  station with an encoder operable to encode a data packet over a resource unit, a
7  modulator operable to modulate encoded bits to a first set of modulated symbols
8  using a first scheme, and—if dual sub-carrier modulation is applied—modulating a
9  second set of symbols from the same encoded bits using a second modulation
10  scheme.  It further discloses a tone mapper that is operable to map the first set of
11  modulated symbols onto the first half of frequency subcarriers of the resource unit,
12  and to map the second set of modulated symbols onto a second half of frequency
13  subcarriers.  It also discloses a transmitter operable to transmit the data packet to a
14  destination station.

15                                          **NXP**

16      53.    NXP manufactures, uses, imports, offers for sale, and/or sells NXP
17  multicore processors and/or microcontrollers with Multi-layer AHB Matrix,
18  specifically including but not limited to LPC5500 Series (the "Accused '845 NXP
19  Products"), NXP i.MX Family devices with HAB and/or AHAB secure boot
20  features, specifically including but not limited to i.MX25, i.MX6, i.MX 8QuadMax
21  and i.MX 8QuadPlus (the "Accused '451 NXP Products"), and NXP i.MX Family
22  products, specifically including but not limited to i.MX RT Series, i.MX6 Series,
23  i.MX7 Series, and i.MX8 Series (the "Accused '037 NXP Products").

24      54.    NXP manufactures, uses, imports, offers for sale, and/or sells wireless
25  microcontrollers that incorporate the schemes for coexistence and dual sub-carrier
26  modulation claimed in the Asserted Patents.  These Wi-Fi products include, but are
27  not limited to, NXP's Wi-Fi 5 products (*e.g.*, 88W8887, 88W8897, 88W8987,
28  88W8997, and 88W8964), and NXP's Wi-Fi 6 products (*e.g.*, 88W9064, 88W9068,

-17-

1  88W9000S,    88Q9098,    88W9098,    IW620,    CW641,    WLAN8101C,    and
2  WLAN8101H).  Upon information and belief, these products are compliant with the
3  802.11ac and/or 802.11ax standards.

4  **Avnet**

5  55.  Avnet, on information and belief, uses, imports, offers for sale, and/or
6  sells at least one of the Accused '845 NXP Products, the Accused '451 NXP
7  products, and the Accused '037 NXP products.

8  56.  Avnet uses, imports, offers for sale, and/or sells wireless
9  microcontrollers that incorporate the schemes for coexistence and dual sub-carrier
10 modulation claimed in the Asserted Patents.  These Wi-Fi products include, but are
11 not limited to, NXP's Wi-Fi 5 products (*e.g.*, 88W8887, 88W8897, 88W8987,
12 88W8997, and 88W8964), and NXP's Wi-Fi 6 products (*e.g.*, 88W9064, 88W9068,
13 88W9000S,    88Q9098,    88W9098,    IW620,    CW641,    WLAN8101C,    and
14 WLAN8101H).  Upon information and belief, these products are compliant with the
15 802.11ac and/or 802.11ax standards.

16 **Arrow**

17 57.  Arrow, on information and belief, uses, imports, offers for sale, and/or
18 sells at least one of the Accused '845 NXP Products, the Accused '451 NXP
19 products, and the Accused '037 NXP products.

20 58.  Arrow uses, imports, offers for sale, and/or sells wireless
21 microcontrollers that incorporate the schemes for coexistence and dual sub-carrier
22 modulation claimed in the Asserted Patents.  These Wi-Fi products include, but are
23 not limited to, NXP's Wi-Fi 5 products (*e.g.*, 88W8887, 88W8897, 88W8987,
24 88W8997, and 88W8964), and NXP's Wi-Fi 6 products (*e.g.*, 88W9064, 88W9068,
25 88W9000S,    88Q9098,    88W9098,    IW620,    CW641,    WLAN8101C,    and
26 WLAN8101H).  Upon information and belief, these products are compliant with the
27 802.11ac and/or 802.11ax standards.

28

COMPLAINT

**Bosch**

59.    Bosch, on information and belief, uses, imports, offers for sale, and/or sells at least one of the Accused '451 NXP products and the Accused '037 NXP products at least by selling and offering to sell the Accused '451 NXP Products and the Accused '037 NXP products as part of their own products in the United States, including but not limited to Bosch ICAM2-ECU.

**Denso**

60.    Denso, on information and belief, uses, imports, offers for sale, and/or sells at least one of the Accused '451 NXP Products and the Accused '037 NXP products at least by selling and offering to sell the Accused '451 NXP Products and the Accused '037 NXP products as part of their own products in the United States, including but not limited to V2X systems.

**Continental**

61.    Continental, on information and belief, uses, imports, offers for sale, and/or sells at least one of the Accused '451 NXP products and the Accused '037 NXP products at least by selling and offering to sell the Accused '451 NXP Products and the Accused '037 NXP products as part of their own products in the United States, including but not limited to Continental 334 7" VP2 NAFTA SDARS NAV.

## COUNT I

## Infringement of the '845 Patent

62.    MediaTek re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

63.    In violation of 35 U.S.C. § 271(a), Defendants NXP, Avnet, and Arrow have infringed the '845 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority, the Accused '845 NXP Products, which practice each and every limitation of at least claims 1-4 of the '845 patent. These Defendants have infringed literally and/or under the doctrine of equivalents.

64.     The Accused '845 NXP Products embody every limitation of at least claim 1 of the '845 patent, literally or under the doctrine of equivalents, as set forth below.   The further descriptions below, which are based on publicly available information, are preliminary examples and are non-limiting.

65.     The Accused '845 NXP Products include a "system" as recited in the '845 patent.



LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 8.

66.     The Accused '845 NXP Products each include "a first data processing subsystem" identified in the rectangle below.  Such "first data processing subsystem"

comprises a "first processor" (e.g., Arm Cortex-M33 (CPU0)) coupled to a first bus as a first bus master.



LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 8.

- ■ ARM Cortex-M33 core (CPU0, r0p3):
  - ◆ Running at a CPU frequency of up to 150 MHz (device revision 1B only).
  - ◆ TrustZone®, Floating Point Unit (FPU) and Memory Protection Unit (MPU).
  - ◆ ARM Cortex M33 built-in Nested Vectored Interrupt Controller (NVIC).
  - ◆ Non-maskable Interrupt (NMI) input with a selection of sources.
  - ◆ Serial Wire Debug with eight breakpoints and four watch points. Includes Serial Wire Output for enhanced debug capabilities.
  - ◆ System tick timer.

LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 1.

67.    The Accused '845 NXP Products each include "a second data processing subsystem" identified in the rectangle below.   Such "second data

-21-

1  processing subsystem" comprises a "second processor" (*e.g.*, ARM Cortex-M33 co-

2  processor (CPU1)) coupled to a second bus as a second bus master.



LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 8.

- ■ ARM Cortex-M33 co-processor (CPU1, r0p3):
  - ◆ Running at a CPU frequency of up to 150 MHz (device revision 1B only).
  - ◆ The configuration of this instance does not include MPU, FPU, DSP, ETM, and Trustzone.
  - ◆ System tick timer.

LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 1.

26  68.   The Accused '845 NXP Products each include "a direct memory access

27  (DMA) subsystem" identified in the rectangle below.  Such "direct memory access

1 (DMA) subsystem" comprises a "DMA controller" (*e.g.*, DMA0 controller and/or

2 DMA1 controller) coupled to a third bus as a third bus master.



LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 8.

■ Digital peripherals:
  ◆ DMA0 controller with 23 channels and up to 22 programmable triggers, able to access all memories and DMA-capable peripherals.
  ◆ DMA1 controller with 10 channels and up to 15 programmable triggers, able to access all memories and DMA-capable peripherals.

LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 3.

25     69.     The Accused '845 NXP Products each include "a first slave subsystem"

26 identified in the rectangle below.  Such "a first slave subsystem" comprises a

27 "memory unit" (*e.g.*, the flash memory and/or the SRAMs) coupled to a fourth bus.

28

-23-



Fig 3.    LPC55S6x Block diagram

LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 8.

■ On-chip memory:
  ◆ Up to 640 KB on-chip flash program memory with flash accelerator and 512 byte page erase and write.
  ◆ Up to 320 KB total SRAM consisting of 32 KB SRAM on Code Bus, 272 KB SRAM on System Bus (272 KB is contiguous), and additional 16 KB USB SRAM on System Bus which can be used by the USB interface or for general purpose use.

LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 2.

70.    The Accused '845 NXP Products each include "a second slave subsystem" identified in the rectangles below.  Such "a second slave subsystem" (*e.g.*, SDIO and/or GPIO) comprises a fifth bus.

5.   **Block diagram**



Fig 3.   LPC55S6x Block diagram

LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 8.

- ◆ Secured digital input/output (SD/MMC and SDIO) card interface with DMA support. SDIO with support for up to two cards. Supported card types are MMC, SDIO, and CE-ATA. Supports SD2.0, and SDR25 (52MHz).
- ◆ CRC engine block can calculate a CRC on supplied data using one of three standard polynomials with DMA support.
- ◆ Up to 64 General-Purpose Input/Output (GPIO) pins.
- ◆ GPIO registers are located on the AHB for fast access. The DMA supports GPIO ports.

LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 3.

71.   The Accused '845 NXP Products each include a Multilayer AHB Matrix associated with the first slave subsystem (*e.g.*, the flash memory and/or the SRAMs), having each of the first, second, third and fourth busses coupled thereto.

-25-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



5. Block diagram

Fig 3. LPC55S6x Block diagram

LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 8.

### 7.14 AHB multilayer matrix

The LPC55S6x uses a multi-layer AHB matrix to connect the CPU buses and other bus masters to peripherals in a flexible manner that optimizes performance by allowing peripherals that are on different slave ports of the matrix to be accessed simultaneously by different bus masters. The device block diagram in Figure 3 shows details of the available matrix connections.

LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 43.

72.    The Accused '845 NXP Products include a first arbitration unit identified in the example below.

-26-

1

2

3

4

5

6

7

8

9

10

11



Multi-layer AHB V2.0 Technical Overview at 1-3.

12

13

14

15

16

17

18

19

20

21



22

23

Multi-layer AHB V2.0 Technical Overview at 1-5.

24

25

26

27

28

73.    The Accused '845 NXP Products each include a first arbitration unit (e.g., the "arbitor" identified above) configured and arranged to arbitrate among at least the first data processing subsystem (*e.g.*, the subsystem including Arm Cortex-M33 (CPU0)), the second data processing subsystem (*e.g.*, the subsystem including ARM Cortex-M33 co-processor (CPU1)), and the DMA subsystem (*e.g.*, the DMA

-27-

subsystem including DMA0 controller and/or DMA1 controller) for access to the
first slave subsystem (*e.g.*, the flash memory and/or the SRAMs), and to couple the
fourth bus to any selected one of at least the first, second, and third busses so as to
enable a selected one of at least the first data processing subsystem, the second data
processing subsystem, and the DMA subsystem to access the first slave subsystem.



Multi-layer AHB V2.0 Technical Overview at 1-7.

74.    The Accused '845 NXP Products each include a Multilayer AHB Matrix
associated with the second slave subsystem (*e.g.*, SDIO and/or GPIO), having each
of the first, second, third and fifth busses coupled thereto.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



5. **Block diagram**

Fig 3.   LPC55S6x Block diagram

LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 8.

## 7.14   AHB multilayer matrix

The LPC55S6x uses a multi-layer AHB matrix to connect the CPU buses and other bus masters to peripherals in a flexible manner that optimizes performance by allowing peripherals that are on different slave ports of the matrix to be accessed simultaneously by different bus masters. The device block diagram in Figure 3 shows details of the available matrix connections.

LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 43.

75.    The Accused '845 NXP Products include a second arbitration unit identified in the example below.

1
2
3
4
5
6
7
8
9
10



Multi-layer AHB V2.0 Technical Overview at 1-3.

11
12
13
14
15
16
17
18
19
20
21



Multi-layer AHB V2.0 Technical Overview at 1-5.

22

23    76.    The Accused '845 NXP Products each include a second arbitration unit
24  (*e.g.*, the "arbitor" identified above) configured and arranged to arbitrate among at
25  least the first data processing subsystem (*e.g.*, the subsystem including Arm Cortex-
26  M33 (CPU0)), the second data processing subsystem (*e.g.*, the subsystem including
27  ARM Cortex-M33 co-processor (CPU1)), and the DMA subsystem (*e.g.*, the DMA

28

subsystem including DMA0 controller and/or DMA1 controller) for access to the second slave subsystem (*e.g.*, SDIO and/or GPIO), and to couple the fifth bus to any selected one of at least the first, second, and third busses so as to enable a selected one of at least the first data processing subsystem, the second data processing subsystem, and the DMA subsystem to access the second slave subsystem.



Multi-layer AHB V2.0 Technical Overview at 1-7.

77.    Each of the first and second arbitration units (*e.g.*, the two arbitors within the Multilayer AHB Matrix identified below) is configured and arranged to operate independently such the first arbitration unit can enable any one of the first data processing subsystem (*e.g.*, the subsystem including Arm Cortex-M33 (CPU0)), the second data processing subsystem (*e.g.*, the subsystem including ARM Cortex-M33 co-processor (CPU1)), and the DMA subsystem (*e.g.*, the DMA subsystem including DMA0 controller and/or DMA1 controller) to access the first slave subsystem (*e.g.*, the flash memory and/or the SRAMs) at the same time that the second arbitration unit enables any other of the first data processing subsystem, the

second data processing subsystem, and the DMA subsystem to access the second slave subsystem (*e.g.*, SDIO and/or GPIO).



5. **Block diagram**

Fig 3.    LPC55S6x Block diagram

LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 8.

78.    Each of the first and second arbitration units (*e.g.*, the two arbiters within the Multilayer AHB Matrix identified below) is configured and arranged to operate independently according to the AHB multilayer matrix protocols, which allows "same time" access as recited in the claim.

### 7.14  AHB multilayer matrix

The LPC55S6x uses a multi-layer AHB matrix to connect the CPU buses and other bus masters to peripherals in a flexible manner that optimizes performance by allowing peripherals that are on different slave ports of the matrix to be accessed simultaneously by different bus masters. The device block diagram in Figure 3 shows details of the available matrix connections.

-32-

LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 43.



Figure 1-2 Multi-layer interconnect topology

Multi-layer AHB V2.0 Technical Overview at 1-3.



Figure 1-5 Multiple masters on one layer

Multi-layer AHB V2.0 Technical Overview at 1-5.



Multi-layer AHB V2.0 Technical Overview at 1-7.

79.    The DMA subsystem (*e.g.*, the DMA subsystem including DMA0 controller and/or DMA1 controller) is configured and arranged such that, when the first and second arbitration units enables the DMA subsystem to access each of the first and second slave subsystems, the DMA controller can cause data to be transferred between the first slave subsystem and the second slave subsystem via the third bus, because the DMA controller allows peripheral-to-memory, memory-to-peripheral, and memory-to-memory transactions as set forth below.

**7.29.1    DMA controller**
The DMA controller allows peripheral-to memory, memory-to-peripheral, and memory-to-memory transactions. Each DMA stream provides unidirectional DMA transfers for a single source and destination.

LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 62.

Two identical DMA controllers are provided on the LPC55S6x. The user may elect to dedicate one of these to CPU0 and the other for use by the CPU1 and/or one may be used as a secure DMA the other non-secure.

LPC55S6x Product data sheet (Rev. 1.9 — 10 February 2020) at 63.

80.    NXP has had knowledge of the '845 Patent and its infringement of the '845 Patent at least since its acquisition of Freescale Semiconductor, Ltd. ("Freescale").   The '845 Patent was asserted by MediaTek against Freescale in *MediaTek Inc. v. Freescale Semiconductor, Inc.*, Case No. 11-cv-5341 (N.D. Cal.) (the "Freescale Litigation") against similar products.   If NXP did not have actual knowledge at that time, it was willfully blind to the existence of the '845 Patent and its infringement of the '845 Patent after it acquired Freescale.   Under the circumstances present here, NXP knew or should have known of the high probability that NXP had included within its products technologies that infringed the '845 patent.   NXP should have known that its conduct was infringing at least following its acquisition of Freescale.

81.    MediaTek is informed and believes, and thereon alleges, that NXP actively, knowingly, and intentionally has induced infringement of the '845 patent by, for example, controlling the design and manufacture of, offering for sale, selling, supplying, and otherwise providing instruction and guidance regarding the above-described products with the knowledge and specific intent to encourage and facilitate infringing uses of such products by its customers both inside and outside the United States. For example, NXP publicly provides documentation, including datasheets available through NXP's publicly accessible datasheets, instructing customers on uses of NXP's products that infringe the '845 patent. *See, e.g.*, https://www.nxp.com/products/processors-and-microcontrollers/arm-microcontrollers/general-purpose-mcus/lpc5500-cortex-m33/high-efficiency-arm-cortex-m33-based-microcontroller-family:LPC55S6x.  On information and belief, NXP's customers directly infringe the '845 patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United

1  States, without authority or license, products containing the above-described NXP
2  products.

3       82.    MediaTek is informed and believes, and thereon alleges, that NXP has
4  contributed to the infringement by its customers of the '845 Patent by, without
5  authority, importing, selling and offering to sell within the United States materials
6  and apparatuses for practicing the claimed invention of the '845 patent both inside
7  and outside the United States. For example, the above described products constitute a
8  material part of the inventions of the '845 patent and are not staple articles or
9  commodities of commerce suitable for substantial non-infringing use. On
10  information and belief, NXP knows that the above-described products constitute a
11  material part of the inventions of the '845 patent and are not staple articles or
12  commodities of commerce suitable for substantial non-infringing use. On
13  information and belief, NXP's customers directly infringe the '845 patent by, for
14  example, making, using, offering to sell, and selling within the United States, and
15  importing into the United States, without authority or license, products containing the
16  above described NXP products.

17       83.    Defendants are not authorized to practice the claims of the '845 patent.

18       84.    By reason of Defendants' infringement, MediaTek has suffered
19  substantial damages.

20       85.    MediaTek is entitled to recover the damages sustained as a result of
21  Defendants' wrongful acts in an amount subject to proof at trial.

22       86.    MediaTek has complied with the requirements of 35 U.S.C. § 287(a) at
23  least because NXP has been aware of the '845 patent and its infringement at least
24  since its acquisition of Freescale Semiconductor, Ltd.    In addition, MediaTek
25  provided actual notice of its infringement allegation to Defendants through the filing
26  of this complaint.

27       87.    MediaTek is informed and believes, and thereon alleges, that
28  Defendants' (NXP, Avnet, and Arrow) infringement of the '845 patent has been and

continues to be willful.  As noted above, NXP has had knowledge of the '845 patent and its infringement of the '845 patent at least since its acquisition of Freescale. Avnet and Arrow have had knowledge of the '845 patent and its infringement of the '845 patent at least since the service of this complaint.  Defendants (NXP, Avnet, and Arrow) have deliberately continued to infringe in a wanton, malicious, and egregious manner, with reckless disregard for MediaTek's patent rights.  Thus, Defendants' (NXP, Avnet, and Arrow) infringing actions have been and continue to be consciously wrongful.

88.    Defendants' infringement of the '845 patent is exceptional and entitles MediaTek to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT II

## Infringement of the '451 Patent

89.    MediaTek re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

90.    In violation of 35 U.S.C. § 271(a), Defendants identified in the Complaint have infringed the '451 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority, the Accused '451 NXP Products which practice each and every limitation of at least claims 1 and 4 of the '451 patent.  Defendants have infringed literally and/or under the doctrine of equivalents.

91.    The Accused '451 NXP Products embody every limitation of at least claim 1 of the '451 patent, literally or under the doctrine of equivalents, as set forth below.  The further descriptions below, which are based on publicly available information, are preliminary examples and are non-limiting.

92.    The Accused '451 NXP Products include a "device" as recited in the '451 patent as shown below.

-37-



i.MX 8QuadMax Automotive and Infotainment Applications Processors, Document Number: IMX8QMAEC at 7 (Rev. 1, 12/2020).

93.    The Accused '451 NXP Products each include a port (e.g., Low Speed I/O subsystem, including but not limited to GPIO, SPI, USB, BOOT_MODE0 pin, BOOT_MODE1 pin, etc.) configured to receive at least one operating mode signal (e.g., Boot Mode signals), wherein the at least one operating mode signal is indicative of a first operating mode (e.g., a Secure Boot mode, the Advanced High Assurance Boot, and/or the Boot mode to EL3, Internal Boot).



i.MX 8QuadMax Automotive and Infotainment Applications Processors, Document Number: IMX8QMAEC at 7 (Rev. 1, 12/2020).

# Boot process

Coming out of a reset state the i.MX8 ROM (firmware that is stored in non-volatile memory of the i.MX8) reads the boot mode pins to determine the boot media/device that will be used.

The following table indicates the available options on a i.MX8QXP, the i.MX8 reads the boot mode pads and based in the configuration selects the desired boot device.

**Table 5-8.   Boot Device Selection**

| BOOT_MODE[3:0] | Boot Device |
| --- | --- |
| 0010 | eMMC Boot |
| 0011 | SD Boot |
| 0100 | NAND Boot - 128 pages in block |
| 0101 | NAND Boot - 32 pages in block |
| 0110 | FlexSPI Boot - 3B Read |
| 0111 | FlexSPI Boot - Hyperflash 3.0V |

https://community.nxp.com/t5/i-MX-Processors-Knowledge-Base/i-MX8-Boot-process-and-creating-a-bootable-image/ta-p/1101253

1
2
3
4
5
6
7

Table 127. 29 × 29 mm functional contact assignments (continued)

| Ball | Ball Name | Power Domain | Ball Type[1] | Reset Condition | | |
|------|-----------|--------------|-----------|-----------------|---|---|
| | | | | Default mode | Default function | State[2] |
| BB44 | SCU_BOOT_MODE0 | VDD_SCU_1P8 | SCU | | Not muxed | PD |
| BC45 | SCU_BOOT_MODE1 | | | | | |
| BJ53 | SCU_BOOT_MODE2 | | | | | |
| BA43 | SCU_BOOT_MODE3 | | | | | |
| AY42 | SCU_BOOT_MODE4 | | | ALT0 | SCU_BOOT_MODE4 | |
| BK52 | SCU_BOOT_MODE5 | | | | SCU_BOOT_MODE5 | |

8
9

i.MX 8QuadMax Automotive and Infotainment Applications Processors, Document Number: IMX8QMAEC at 138 (Rev. 1, 12/2020).

10

Table 113. Fuse and associated pins used for Boot

11
12
13
14

| Interface | IP Instance | Allocated Pads During Boot | Comment |
|-----------|-------------|----------------------------|---------|
| BOOT_MODE[0] | Input | SCU_BOOT_MODE0 | Boot mode selection |
| BOOT_MODE[1] | Input | SCU_BOOT_MODE1 | |
| BOOT_MODE[2] | Input | SCU_BOOT_MODE2 | |
| BOOT_MODE[3] | Input | SCU_BOOT_MODE3 | |

15
16

i.MX 8DualX Industrial Applications Processors, Document Number: IMX8DXIEC at 108 (Rev. 0, 05/2020).

17
18
19
20

| AHAB | Advanced High Assurance Boot | A software library executed in internal ROM on the NXP processor at boot time which, among other things, authenticates software in external memory by verifying digital signatures in accordance with a CSF. This document is strictly limited to processor running AHAB. |
|------|------------------------------|---|

21

AN12312 Secure Boot on i.MX 8 and i.MX 8X Families using AHAB at 2 (Rev. 0 — May 2019).

22
23

In the description that follows, the term *reset* is used in contexts where there is no difference between the effect of a Cold reset and the effect of a Warm reset.

On a reset, the PE enters the highest implemented Exception level.

24
25
26

Arm® Architecture Reference Manual, Armv8, for Armv8-A architecture profile, ARM DDI 0487G.a (ID011921) at D1-2453.

27
28

COMPLAINT

You always really need *some* secure code.

The CPU will boot to EL3 which is a secure state (ie using TrustZone) so even if all you want to do is jump to NS EL1 you will need some TrustZone code to run first. Also even if you are not *using* using TrustZone there are still a lot of things that need to be configured from secure code (eg the GIC) and some runtime actions that can only be done by secure code (eg flush the entire cache.)

https://community.arm.com/developer/ip-products/processors/trustzone-for-armv8-m/f/trustzone-armv8-m-forum/6085/can-the-linux-boot-up-without-arm-trusted-firmware-if-the-trustzone-is-not-necessary

## 5.4    Boot Sequence

CL-SOM-iMX8 boot sequence defines which interface/media is used by CL-SOM-iMX8 to load and execute the initial software (such as U-boot). CL-SOM-iMX8 can load initial software from the following interfaces/media:

- The on-board primary boot device (eMMC with pre-flashed boot-loader)
- An external SD/MMC card using the MMC/SD/SDIO 2 interface

CL-SOM-iMX8 will query boot devices/interfaces for initial software in the order defined by the active boot sequence. A total of two different boot sequences are supported by CL-SOM-iMX8:

- Standard sequence: Designed for normal system operation with the on-board primary boot device as the boot media.
- Alternate sequence: Designed allow recovery from an external boot device in case of data corruption on the on-board primary boot device. Using the alternate sequence allows CL-SOM-iMX8 to boot from an external SD card, effectively bypassing the onboard eMMC.

The initial logic value of ALT_BOOT signal defines which of the supported boot sequences is used by the system.

**Table 45    Alternative Boot selection signal**

| Signal Name | Pin # | Type | Description | Availability |
|---|---|---|---|---|
| ALT_BOOT | 185 | I | Active high alternate boot sequence select input. Leave floating or tie low for standard boot sequence | Always available |

**Table 46    CL-SOM-iMX8 Boot sequences**

| sequence | ALT_BOOT | First |
|---|---|---|
| Standard | Low or floating | Onboard eMMC (Primary boot storage) |
| Alternate | High | SD card on MMC/SD/SDIO2 interface |

https://www.compulab.com/wp-content/uploads/2018/01/cl-som-imx8_reference-guide_2019-02-14.pdf at 35.



**Figure 1-1. i.MX25 High-Level Block Diagram**

https://www.nxp.com/docs/en/reference-manual/IMX25RM.pdf, page 37

**Table 4-13. Boot Related Pins**

| Pin Name | Direction at Boot | eFUSE Name | Details |
|---|---|---|---|
| BOOT_MODE0 | INPUT | N/A | Boot mode select pins |
| BOOT_MODE1 | INPUT | N/A | |

https://www.nxp.com/docs/en/reference-manual/IMX25RM.pdf, page 72

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 1.1   Boot Type

The type of boot is chosen by the state of the Boot Mode pins (BOOT_MODE0 and BOOT_MODE1). These pins should be configured on the system board with pull-up or pull-down resistors to enter into the desired boot mode. The values of these pins are sampled during reset and after reset these pins can be configured to work as GPIOs. The value of the BOOT_MODE pins is stored in the CCM Status Register (RCSR) of the CCM. The possible boot type options are:

- Internal Boot (utilizing ROM code and HAB)
- FSL Test Mode (reserved for factory use)
- Eternal Boot (direct boot without much interaction from ROM and without HAB)
- USB/UART Bootloader (allows code to be downloaded via USB/UART ports)

Table 1 shows more details of the boot types.

**Table 1. Boot Mode Summary**

| BMOD [1:0] | Boot Type | Boot Details |
|---|---|---|
| 00 | Internal Boot | Executes ROM code, which handles boot from following sources:<br>• NOR Flash (via WEIM, 16-bit slow asynchronous mode for debugging purpose only)<br>• OneNAND<br>• CSPI (serial Flash, only on chip select #1) Or via I$^2$C<br>• NAND Flash<br>• SD/MMC (including high-capacity MoviNAND boot through MMC interface)<br>• USB, UART boot (fallback option for all other modes when an error exception occurs) |
| 01 | FSL Test Mode | This mode is reserved for device testing and is intended for factory use only |
| 10 | External (Direct) Boot | Direct boot via the interface, independent of boot ROM code |
| 11 | USB/UART Boot Loader | Load and execute code via serial devices:<br>• USB (Full-Speed, via integrated OTG PHY or external via the OTG interface[1])<br>• UART |

https://www.nxp.com/docs/en/application-note/AN3684.pdf, page 2

94.    The Accused '451 NXP Products each include one or more secured assets (e.g., SD/MMC, eMMC/SD card, FlexSPI Flash, NAND, Serial Download Protocol (USB), RNG, Secure JTAG, Tamper Detection, Ciphers (ECC, RSA), Secure RTC, Secure RAM, Secure Clock, eFuse Key Storage, CAAM, NOR Flash, OneNAND, CSPI, USB, UART boot, etc.).



i.MX 8QuadMax Automotive and Infotainment Applications Processors, Document Number: IMX8QMAEC at 7 (Rev. 1, 12/2020).



https://www.nxp.com/products/processors-and-microcontrollers/arm-processors/i-mx-applications-processors/i-mx-8-processors/i-mx-8m-plus-arm-cortex-a53-machine-learning-vision-multimedia-and-industrial-iot:IMX8MPLUS

| CAAM | Cryptographic Accelerator and Assurance Module | CAAM is a cryptographic accelerator and assurance module. CAAM implements several encryption and hashing functions, a run-time integrity checker, and a Pseudo Random Number Generator (PRNG). CAAM also implements a Secure Memory mechanism. In this device the security memory provided is 64 KB. |
|---|---|---|

i.MX 8QuadMax Automotive and Infotainment Applications Processors, Document Number: IMX8QMAEC at 8 (Rev. 1, 12/2020).

| RAM 64 KB Secure RAM | Secure/non-secure RAM | Secure/non-secure Internal RAM, interfaced through the CAAM. |
|---|---|---|
| RAM 256 KB | Internal RAM | Internal RAM, which is accessed through OCRAM memory controllers. |
| RNG | Random Number Generator | The purpose of the RNG is to generate cryptographically strong random data. It uses a true random number generator (TRNG) and a pseudo-random number generator (PRNG) to achieve true randomness and cryptographic strength. The RNG generates random numbers for secret keys, per message secrets, random challenges, and other similar quantities used in cryptographic algorithms. |

i.MX 8QuadMax Automotive and Infotainment Applications Processors, Document Number: IMX8QMAEC at 12 (Rev. 1, 12/2020).

95.    The Accused '451 NXP Products each include security hardware (e.g., the System Control Unit) coupled to receive (e.g., from the Low Speed I/O) the at least one operating mode signal as identified above.



i.MX 8QuadMax Automotive and Infotainment Applications Processors, Document Number: IMX8QMAEC at 7 (Rev. 1, 12/2020).

1

2

The i.MX25 out-of-reset boot sequence makes use of the High-Assurance Boot (HAB) library to provide a secure boot environment. The HAB process utilizes a combination of hardware and software, including

3

https://www.nxp.com/docs/en/reference-manual/IMX25RM.pdf, page 133

4

5

## 1.1   Boot Type

6

7

The type of boot is chosen by the state of the Boot Mode pins (BOOT_MODE0 and BOOT_MODE1). These pins should be configured on the system board with pull-up or pull-down resistors to enter into the desired boot mode. The values of these pins are sampled during reset and after reset these pins can be configured to work as GPIOs. The value of the BOOT_MODE pins is stored in the CCM Status Register (RCSR) of the CCM. The possible boot type options are:

8

9

- Internal Boot (utilizing ROM code and HAB)
- FSL Test Mode (reserved for factory use)
- Eternal Boot (direct boot without much interaction from ROM and without HAB)
- USB/UART Bootloader (allows code to be downloaded via USB/UART ports)

10

11

Table 1 shows more details of the boot types.

12

**Table 1. Boot Mode Summary**

13

| BMOD [1:0] | Boot Type | Boot Details |
|---|---|---|
| 00 | Internal Boot | Executes ROM code, which handles boot from following sources:<br>• NOR Flash (via WEIM, 16-bit slow asynchronous mode for debugging purpose only)<br>• OneNAND<br>• CSPI (serial Flash, only on chip select #1) Or via I$^2$C<br>• NAND Flash<br>• SD/MMC (including high-capacity MoviNAND boot through MMC interface)<br>• USB, UART boot (fallback option for all other modes when an error exception occurs) |
| 01 | FSL Test Mode | This mode is reserved for device testing and is intended for factory use only |
| 10 | External (Direct) Boot | Direct boot via the interface, independent of boot ROM code |
| 11 | USB/UART Boot Loader | Load and execute code via serial devices:<br>• USB (Full-Speed, via integrated OTG PHY or external via the OTG interface[1])<br>• UART |

14

15

16

17

18

19

20

https://www.nxp.com/docs/en/application-note/AN3684.pdf, page 2

21

22

96.     In each of the Accused '451 NXP Products, the security hardware (e.g.,

23

the System Control Unit, HAB, AHAB, EL3 related hardware) is further coupled to

24

control access to the secured assets (e.g., SD/MMC, eMMC/SD card, FlexSPI Flash,

25

NAND, Serial Download Protocol (USB), RNG, Secure JTAG, Tamper Detection,

26

Ciphers (ECC, RSA), Secure RTC, Secure RAM, Secure Clock, eFuse Key Storage,

27

CAAM, NOR Flash, OneNAND, CSPI, USB, UART boot, etc.) dependent upon the

28

at least one operating mode signal (e.g., dependent upon the Boot Mode(s)) as shown below.



i.MX 8QuadMax Automotive and Infotainment Applications Processors, Document Number: IMX8QMAEC at 7 (Rev. 1, 12/2020).



https://www.nxp.com/products/processors-and-microcontrollers/arm-processors/i-mx-applications-processors/i-mx-8-processors/i-mx-8m-plus-arm-cortex-a53-machine-learning-vision-multimedia-and-industrial-iot:IMX8MPLUS

# Boot process

Coming out of a reset state the i.MX8 ROM (firmware that is stored in non-volatile memory of the i.MX8) reads the boot mode pins to determine the boot media/device that will be used.

The following table indicates the available options on a i.MX8QXP, the i.MX8 reads the boot mode pads and based in the configuration selects the desired boot device.

### Table 5-8.  Boot Device Selection

| BOOT_MODE[3:0] | Boot Device |
|---|---|
| 0010 | eMMC Boot |
| 0011 | SD Boot |
| 0100 | NAND Boot - 128 pages in block |
| 0101 | NAND Boot - 32 pages in block |
| 0110 | FlexSPI Boot - 3B Read |
| 0111 | FlexSPI Boot - Hyperflash 3.0V |

https://community.nxp.com/t5/i-MX-Processors-Knowledge-Base/i-MX8-Boot-process-and-creating-a-bootable-image/ta-p/1101253

### Table 127. 29 × 29 mm functional contact assignments (continued)

| Ball | Ball Name | Power Domain | Ball Type[1] | Reset Condition | | |
|---|---|---|---|---|---|---|
| | | | | Default mode | Default function | State[2] |
| BB44 | SCU_BOOT_MODE0 | VDD_SCU_1P8 | SCU | | Not muxed | PD |
| BC45 | SCU_BOOT_MODE1 | | | | | |
| BJ53 | SCU_BOOT_MODE2 | | | | | |
| BA43 | SCU_BOOT_MODE3 | | | | | |
| AY42 | SCU_BOOT_MODE4 | | | ALT0 | SCU_BOOT_MODE4 | |
| BK52 | SCU_BOOT_MODE5 | | | | SCU_BOOT_MODE5 | |

i.MX 8QuadMax Automotive and Infotainment Applications Processors, Document Number: IMX8QMAEC at 138 (Rev. 1, 12/2020).

### Table 113. Fuse and associated pins used for Boot

| Interface | IP Instance | Allocated Pads During Boot | Comment |
|---|---|---|---|
| BOOT_MODE[0] | Input | SCU_BOOT_MODE0 | Boot mode selection |
| BOOT_MODE[1] | Input | SCU_BOOT_MODE1 | |
| BOOT_MODE[2] | Input | SCU_BOOT_MODE2 | |
| BOOT_MODE[3] | Input | SCU_BOOT_MODE3 | |

i.MX 8DualX Industrial Applications Processors, Document Number: IMX8DXIEC
at 108 (Rev. 0, 05/2020).

| AHAB | Advanced High Assurance Boot | A software library executed in internal ROM on the NXP processor at boot time which, among other things, authenticates software in external memory by verifying digital signatures in accordance with a CSF. This document is strictly limited to processor running AHAB. |
|------|------------------------------|-----------------------------------------------------------------------------------------------------|

AN12312 Secure Boot on i.MX 8 and i.MX 8X Families using AHAB at 2 (Rev. 0
— May 2019).

# Chapter 7
# System Boot

## 7.1    Overview

This chapter describes the system boot sequence of the i.MX25 application processor, and describes the various boot options.

The i.MX25 out-of-reset boot sequence makes use of the High-Assurance Boot (HAB) library to provide a secure boot environment. The HAB process utilizes a combination of hardware and software, including a public key infrastructure (PKI) protocol to protect the system from executing unauthorized images or programs. In order for the HAB to allow user code to run, the code must be signed by the private key holder which matches with the public key on i.MX25. The HAB library in the i.MX25 boot ROM also provides a number of API functions, which allow the user to authenticate any defined region and signature at run-time.

Three boot modes are supported in the i.MX25. Table 7-1 describes these boot modes in a summary.

**Table 7-1. Boot Mode Summary**

| BOOT_MODE[1:0] | Boot Type[1] | Descriptions |
|----------------|--------------|--------------|
| 0 0 | Internal Boot | When power-on reset, i.MX25 executes the boot ROM code to load the boot image from different boot sources. See Section 7.3.3 for more details. |
| 0 1 | Reserved | Reserved |
| 1 0 | External (Direct) Boot | Direct boot from WEIM interface, independent of boot ROM code. See Section 7.3.4 for more details. |
| 1 1 | USB/UART Serial Boot | Load and execute code using serial devices:<br>• USB OTG (Full-Speed, using integrated PHY or external PHY)<br>• UART<br>See Section 7.3.5 for more details. |

https://www.nxp.com/docs/en/reference-manual/IMX25RM.pdf, pages 133- 134

97.    NXP has had knowledge of the '451 patent and its infringement of the '451 Patent at least since the service of this complaint.

98.    Defendants are not licensed or otherwise authorized to practice the claims of the '451 patent.

99.    By reason of Defendants' infringement, MediaTek has suffered substantial damages.

100.    MediaTek is entitled to recover the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

101.    MediaTek has complied with the requirements of 35 U.S.C. § 287(a) at least because MediaTek provided actual notice of its infringement allegation to Defendants through the filing of this complaint.

102.    MediaTek is informed and believes, and thereon alleges, that NXP actively, knowingly, and intentionally has induced infringement of the '451 patent by, for example, controlling the design and manufacture of, offering for sale, selling, supplying, and otherwise providing instruction and guidance regarding the above-described products with the knowledge and specific intent to encourage and facilitate infringing uses of such products by its customers both inside and outside the United States since NXP has knowledge of the '451 patent and its infringement of the '451 patent.  For example, NXP publicly provides documentation, including datasheets available through NXP's publicly accessible datasheets, instructing customers on uses of NXP's products that infringe the '451 patent.  *See, e.g.,* https://www.nxp.com/products/processors-and-microcontrollers/arm-processors/i-mx-applications-processors/i-mx-8-processors/i-mx-8-family-arm-cortex-a53-cortex-a72-virtualization-vision-3d-graphics-4k-video:i.MX8, https://www.nxp.com/docs/en/application-note/AN3684.pdf.    On information and belief, NXP's customers directly infringe the '451 patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products containing the above-described NXP products.

103.    MediaTek is informed and believes, and thereon alleges, that NXP has contributed to the infringement by its customers of the '451 Patent by, without authority, importing, selling and offering to sell within the United States materials and apparatuses for practicing the claimed invention of the '451 patent both inside and outside the United States.  For example, the above described products constitute a material part of the inventions of the '451 patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use.    On information and belief, NXP knows that the above-described products constitute a material part of the inventions of the '451 patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use.    On information and belief, NXP's customers directly infringe the '451 patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products containing the above described NXP products.

104.    MediaTek is informed and believes, and thereon alleges, that Defendants' infringement of the '451 patent has been and continues to be willful. Defendants have had knowledge of the '451 patent and its infringement of the '451 patent at least since the service of this complaint.  Defendants have deliberately continued to infringe in a wanton, malicious, and egregious manner, with reckless disregard for MediaTek's patent rights.  Thus, Defendants' infringing actions have been and continue to be consciously wrongful.

105.    Defendants' infringement of the '451 patent is exceptional and entitles MediaTek to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT III

### Infringement of the '037 Patent

106.    MediaTek re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

-51-

107.  In violation of 35 U.S.C. § 271(a), Defendants identified in the Complaint have infringed the '037 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority, the Accused '037 NXP Products which practice each and every limitation of at least claim 19 of the '037 patent.  Defendants have infringed literally and/or under the doctrine of equivalents.

108.  The Accused '037 NXP Products embody every limitation of at least claim 19 of the '037 patent, literally or under the doctrine of equivalents, as set forth below.  The further descriptions below, which are based on publicly available information, are preliminary examples and are non-limiting.

109.  The Accused '037 NXP Products include a "central processing unit" as recited in the '037 patent as shown below.



Figure 1-1. i.MX 8QuadXPlus/i.MX 8DualXPlus Simplified Block Diagram

i.MX 8DualX/8DualXPlus/8QuadXPlus Applications Processor Reference Manual, Document Number: IMX8DQXPRM at 15 (Rev. 0, 05/2020).

110.  The Accused '037 NXP Products each include a substrate having formed thereon circuit elements defining a CPU core (e.g., User CM4 Complex, CPU Platform, SCU CM4 Complex, SECO, etc.), a volatile random access memory (e.g., OCRAM, CAAM secure memory, other DDR memories, etc.), a non-volatile

1  memory (*e.g.*, SECO ROM, Boot ROM, Boot source, etc.) and a bus system for

2  connecting said CPU core, said volatile random access memory and said non-volatile

3  memory (*e.g.*, the SSI Bus, the CPU cores' internal buses, and/or the combination of

4  both; *see* below).



Figure 1-1. i.MX 8QuadXPlus/i.MX 8DualXPlus Simplified Block Diagram

i.MX 8DualX/8DualXPlus/8QuadXPlus Applications Processor Reference Manual,
Document Number: IMX8DQXPRM at 15 (Rev. 0, 05/2020).

111.  The Accused '037 NXP Products each include pre-boot information

stored in said non-volatile memory, said pre-boot information including instructions

executable by said CPU core (e.g., SECO FW, SCU FW, the first container, the

second container, etc., described below).

**Table 5-2.  Standard Boot Flow**

| SCU | SECO |
|---|---|
| Initialization sequence for the SCU and the system. Performs minimal HW setup, including the stack in TCM, IRQs, MUs, boot device selection and initialization. Detects the boot stage: Primary boot, Secondary boot, Recovery or Serial Download boot. In this case, it is in Primary mode. | Initialization sequence for the SECO (IRQs, MUs, stack in TCM) and crypto IP/functionality needed by the ROM (CAAM, private bus). Also, the life cycle state is validated. |
| Reads the first container from the boot device into the SECO TCM. The first container is NXP signed, and contains only the SECO FW image. | |
| Sends a SECO FW authentication message to SECO. | |
| Immediately, after the SECO FW authentication request message is sent to the SECO, the SCU will look for and load the second container, from the same boot source. The second container, in this case, will have the SCU FW image (including the DDR initialization sequence), a M4 image, and the AP IPL. The header of the container and the signature, including the DEK blob for the encrypted images, are loaded first, in the CAAM secure memory. The images are then loaded in their target memories. | The SECO FW is now loaded in the SECO TCM, and is ready for authentication. The SECO ROM performs the authentication of the SECO FW. Note that a single algorithm is supported (ECDSA), with a single key size. In case of success, the SECO starts the FW. The SECO sends a status response message to the SCU indicating the success or failure of the SECO FW authentication and whether the container is authorized |
| The SCU FW is loaded in the SCU TCM. The DDR Initialization sequence is also loaded from the second container into the SCU TCM, as part of the SCU FW image. The DDR Initialization sequence will be authenticated by the SECO (as part of the SCU FW image) before being processed by the SCU ROM. | SECO authenticates the second container's header, sends a status response message to the SCU indicating success or failure of authentication and whether the container is authorized. |
| | SECO verifies SCU FW's hash, sends a status response message to SCU indicating success or failure. This step has also verified the DDR Initialization sequence |
| After receiving success responses from SECO for the container header and the SCU FW, the SCU executes the DDR Initialization Image. | |
| With the DRAM initialized, the M4 image is loaded in DRAM. The request to authenticate the M4 image is then sent to the SECO. | |
| The AP IPL image is loaded in DRAM, and the request to authenticate it, is sent to the SECO. | SECO verifies the M4 FW's hash, sends a status response message to SCU indicating success or failure |
| | SECO verifies the AP IPL's hash, sends a status response message to SCU indicating success or failure |
| If the SCU has received success responses for all the images, it will jump to SCU FW. | |

i.MX 8DualX/8DualXPlus/8QuadXPlus Applications Processor Reference Manual, Document Number: IMX8DQXPRM at 115 (Rev. 0, 05/2020).

112.   The Accused '037 NXP Products each include the above identified pre-boot information including a symmetric encryption key for verifying at least a portion of a boot routine signed by using said symmetric encryption key (e.g., the first container and/or the second container verified and signed using AES-GCM mode, MAC, HMAC, and/or GMAC, etc.).

| Block Mnemonic | Block Name | Instances | Description |
|---|---|---|---|
| ADM | Authenticated Debug Module | 1 | Keeps permission policy for Debug access |
| CAAM | Crypto Assurance and Accelerator Module | 1 | Hardware security module for key management and crypto suite of functions (Symmetric, Asymmetric, Hash, RNG) |
| IEE | Inline Encryption/Decryption Engine | 1 | Allows for on-the-fly encryption and decryption for secure storage of data and code |
| Security Controller | Security Controller (M0+) | 1 | Security Microcontroller dedicated to specific security functions |
| SRAM | Secure RAM (64KB) | 1 | SRAM with access controls and auto zeroization |
| SNVS | Secure Non-Volatile Storage (LP and HP) | 1 | RTC timer, security state machine, ONOFF button, SRTC, monotonic counter |
| OTP | OCOTP_CTRL | 1 | Fuse box controller, OTP (keys) - SECO-only port |
| MU | Messaging Unit | 4 | Allows the security subsystem to talk to the system controller and other cores |
| WDOG | Watchdog | 1 | Watchdog timer for hardware acceleration |

i.MX 8DualX/8DualXPlus/8QuadXPlus Applications Processor Reference Manual, Document Number: IMX8DQXPRM at 101 (Rev. 0, 05/2020).

The SECO supports the following features:
- Security Subsystem (SECO)
    - Isolated Security Microcontroller
        - Energy efficient M0+ core supporting 133MHz
        - Interrupt Controller with up to 32 IRQs
        - Security controls through Authenticated Debug Module (ADM)
        - Dedicated 80KB ROM, 80KB RAM with Error Correct Code (ECC)
        - Dedicated One-Time Programmable (OTP) keys
    - Shared Peripherals:
        - 4x Messaging Units (MU) in hardware
        - Real Time Clock (RTC) and Secure RTC (SRTC) timers (SNVS)
    - Private Key Bus interface to DTCP and IEE
    - Cryptographic Acceleration and Assurance Module (CAAM):
        - Two job rings for use by application cores, CM4s
        - Secure Hardware-Only Cryptographic Key Management
        - Encrypted Boot

i.MX 8DualX/8DualXPlus/8QuadXPlus Applications Processor Reference Manual, Document Number: IMX8DQXPRM at 102 (Rev. 0, 05/2020).

COMPLAINT

- Symmetric Engines:
  - AES 128/196/256
  - AES with modes: ECB, CBC, CFB, OFB, CTR
  - Data Encryption Standards (DES), 3DES
- Cryptographic Hash Engine
  - SHA-1, SHA-2 224/256/384/512, MD5
- Message Authentication Codes
  - Hash Message Authentication Code (HMAC)
  - AES-CMAC
  - AES-XBC-MAC
  - AES-CCM
  - AES-GCM
- Random Number Generation (RNG4):
  - True Random Entropy Source
  - Deterministic Random Bit Generator (Hash-based)

i.MX 8DualX/8DualXPlus/8QuadXPlus Applications Processor Reference Manual,
Document Number: IMX8DQXPRM at 103 (Rev. 0, 05/2020).

### 3.1  The types of Secure boot Image

To authenticate secure boot code before running, the plain user image is signed and/or encrypted. The secure boot supports
following types of secure boot images:

- **Signed image**: RSA-2048 signed images.
- **Encrypted image**: AES-GCM encrypted and authenticated images.
- **Signed encrypted image**: Plain image is encrypted first then signed. This image is recommended to use.
- **Encrypted signed image**: Plain image is signed first and then whole image including signature is encrypted.

All secure boot images have image header which provides various parameters to the secure boot to initialize the boot interface,
load address and authenticate/decrypt the image.

AN12385, Rev. 0 (15 March 2019)

### 3.1.2  Encrypted image

The encrypted image contains the following, Figure 9. on page 11

- Encrypted image.
- Image header of the encrypted image(header appended to top of encrypted image).

The encrypted image should be created by encrypting an image using AES-GCM algorithm. An image header is appended to the top of the AES encrypted image. The image header contains image initialization vector(image_IV), header initialization vector(Header_IV), authentication tag of the encrypted image (Auth_tag), and GMAC of the image header(Header_tag). The 'Additional Authentication Data(AAD) 'is 0 during the encryption process.

*[Image GMAC tag, Encrypted_image] = AES-GCM(key = OTP_key, IV = Image_IV, Plain_text = Plain_image, AAD = 0)*

*[Header GMAC tag, 0] = AES-GCM(key = OTP_key, IV = Header_IV, Plain_text = 0, AAD = Encrypted Image Header)*

AN12385, Rev. 0 (15 March 2019)

113.   NXP has had knowledge of the '037 patent and its infringement of the '037 Patent at least since the service of this complaint.

114.   Defendants are not licensed or otherwise authorized to practice the claims of the '037 patent.

115.   By reason of Defendants' infringement, MediaTek has suffered substantial damages.

116.   MediaTek is entitled to recover the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

117.   MediaTek has complied with the requirements of 35 U.S.C. § 287(a) at least because MediaTek provided actual notice of its infringement allegation to Defendants through the filing of this complaint.

118.   MediaTek is informed and believes, and thereon alleges, that NXP actively, knowingly, and intentionally has induced infringement of the '037 patent by, for example, controlling the design and manufacture of, offering for sale, selling, supplying, and otherwise providing instruction and guidance regarding the above-described products with the knowledge and specific intent to encourage and facilitate infringing uses of such products by its customers both inside and outside the United States since NXP has knowledge of the '037 patent and its infringement of the '037 patent.   For example, NXP publicly provides documentation, including datasheets

1  available through NXP's publicly accessible datasheets, instructing customers on
2  uses of NXP's products that infringe the '037 patent. *See, e.g.,*
3  https://www.nxp.com/products/processors-and-microcontrollers/arm-processors/i-
4  mx-applications-processors/i-mx-8-processors/i-mx-8x-family-arm-cortex-a35-3d-
5  graphics-4k-video-dsp-error-correcting-code-on-ddr:i.MX8X,
6  https://www.nxp.com/docs/en/data-sheet/IMX8QXPAEC.pdf.    On information and
7  belief, NXP's customers directly infringe the '037 patent by, for example, making,
8  using, offering to sell, and selling within the United States, and importing into the
9  United States, without authority or license, products containing the above-described
10 NXP products.

11       119.   MediaTek is informed and believes, and thereon alleges, that NXP has
12 contributed to the infringement by its customers of the '037 Patent by, without
13 authority, importing, selling and offering to sell within the United States materials
14 and apparatuses for practicing the claimed invention of the '037 patent both inside
15 and outside the United States.  For example, the above described products constitute
16 a material part of the inventions of the '037 patent and are not staple articles or
17 commodities of commerce suitable for substantial non-infringing use.    On
18 information and belief, NXP knows that the above-described products constitute a
19 material part of the inventions of the '037 patent and are not staple articles or
20 commodities of commerce suitable for substantial non-infringing use.    On
21 information and belief, NXP's customers directly infringe the '037 patent by, for
22 example, making, using, offering to sell, and selling within the United States, and
23 importing into the United States, without authority or license, products containing the
24 above described NXP products.

25       120.  MediaTek is informed and believes, and thereon alleges, that
26 Defendants' infringement of the '037 patent has been and continues to be willful.
27 Defendants have had knowledge of the '037 patent and its infringement of the '037
28 patent at least since the service of this complaint.  Defendants have deliberately

-58-

1 continued to infringe in a wanton, malicious, and egregious manner, with reckless
2 disregard for MediaTek's patent rights.  Thus, Defendants' infringing actions have
3 been and continue to be consciously wrongful.

4      121.  Defendants' infringement of the '037 patent is exceptional and entitles
5 MediaTek to attorneys' fees and costs incurred in prosecuting this action under 35
6 U.S.C. § 285.

**COUNT IV**

**Infringement of the '056 Patent**

9      122.  MediaTek re-alleges and incorporates by reference the allegations of the
10 preceding paragraphs of this Complaint as if fully set forth herein.

11      123.  In violation of 35 U.S.C. § 271(a), Defendants have infringed the '056
12 patent by making, using, selling, offering for sale, and/or importing into the United
13 States, without authority, the aforementioned accused products which practice each
14 and every limitation of at least claim 6 of the '056 patent.  Defendants have infringed
15 literally and/or under the doctrine of equivalents.

16      124.  The accused products include a first radio module providing a Bluetooth
17 communication service that communicates with a Bluetooth-capable device in
18 compliance with the Bluetooth protocol.



COMPLAINT

https://www.nxp.com/products/wireless/wi-fi-plus-bluetooth/88w8987-2-4-5-ghz-dual-band-1x1-wi-fi-5-802-11ac-plus-bluetooth-5-1-solution:88W8987

125.    On information and belief, the accused products operate in compliance with the Bluetooth 5 specification.

## 4    Bluetooth subsystem

### 4.1    2.4 GHz Bluetooth Tx/Rx



- Bluetooth 5
- Bluetooth Class 2
- Bluetooth Class 1

https://www.nxp.com/docs/en/data-sheet/88W8987SDS.pdf

126.    The Bluetooth radio in the accused products communicates on time slots in accordance with the Bluetooth specification.

**2.2.3  Time slots**

The basic piconet physical channel is divided into time slots, each 625 μs in length. The time slots are numbered according to the most significant 27 bits of the Bluetooth clock $CLK_{27-1}$ of the piconet master. The slot numbering ranges from 0 to $2^{27}$-1 and is cyclic with a cycle length of $2^{27}$. The time slot number is denoted as k.

A TDD scheme is used where master and slave alternately transmit, see Figure 2.1. The packet start shall be aligned with the slot start. Packets may extend over up to five time slots.



*Figure 2.1:  Multi-slot packets*

Bluetooth Core Specification 5.2 at 421 https://www.nxp.com/docs/en/data-sheet/88W8987SDS.pdf

127.   The accused products include a second radio module providing a Wi-Fi communication service that communicates with a Wi-Fi-capable device in compliance with the IEEE 802.11 Wi-Fi protocol.



https://www.nxp.com/products/wireless/wi-fi-plus-bluetooth/88w8987-2-4-5-ghz-dual-band-1x1-wi-fi-5-802-11ac-plus-bluetooth-5-1-solution:88W8987

128.   On information and belief, the accused products operate in compliance with the IEEE 802.11ac and/or IEEE 802.11ax specification.

### 3   Wi-Fi subsystem

#### 3.1   IEEE 802.11 standards

- 802.11 data rates of 1 and 2 Mbit/s
- 802.11b data rates of 5.5 and 11 Mbit/s
- 802.11a/g data rates 6, 9, 12, 18, 24, 36, 48, and 54 Mbit/s for multimedia content transmission
- 802.11g/b performance enhancements
- 802.11ac / 802.11n with maximum data rates up to 86.7 Mbit/s (20 MHz channel), 200 Mbit/s (40 MHz channel), 433 Mbit/s (80 MHz channel)

https://www.nxp.com/docs/en/data-sheet/88W8987SDS.pdf

129.   The IEEE 802.11ac and IEEE 802.11ax specifications define sub-frames comprising OFDM symbols.

COMPLAINT

1

## 17. Orthogonal frequency division multiplexing (OFDM) PHY specification

### 17.1 Introduction

#### 17.1.1 General

This clause specifies the PHY entity for an orthogonal frequency division multiplexing (OFDM) system. The OFDM system provides a WLAN with data payload communication capabilities of 6, 9, 12, 18, 24, 36, 48, and 54 Mb/s. The support of transmitting and receiving at data rates of 6, 12, and 24 Mb/s is mandatory. The system uses 52 subcarriers that are modulated using binary or quadrature phase shift keying (BPSK or QPSK) or using 16- or 64-quadrature amplitude modulation (16-QAM or 64-QAM). Forward error correction coding (convolutional coding) is used with a coding rate of 1/2, 2/3, or 3/4.

The OFDM system also provides a "half-clocked" operation using 10 MHz channel spacings with data communications capabilities of 3, 4.5, 6, 9, 12, 18, 24, and 27 Mb/s. The support of transmitting and receiving at data rates of 3, 6, and 12 Mb/s is mandatory when using 10 MHz channel spacing. The half-clocked operation doubles symbol times and clear channel assessment (CCA) times when using 10 MHz channel spacing. The regulatory requirements and information regarding use of this OFDM PHY are in Annex D and Annex E.

The OFDM system also provides a "quarter-clocked" operation using 5 MHz channel spacing with data communication capabilities of 1.5, 2.25, 3, 4.5, 6, 9, 12, and 13.5 Mb/s. The support of transmitting and receiving at data rates of 1.5, 3, and 6 Mb/s is mandatory when using 5 MHz channel spacing. The quarter-clocked operation quadruples symbol times and CCA times when using 5 MHz channel spacing. The regulatory requirements and information regarding use of this OFDM PHY are in Annex D and Annex E.

### 17.1.2 Scope

Subclause 17.1 describes the PHY services provided to the IEEE 802.11 WLAN MAC by the OFDM PHY. The OFDM PHY consists of the following protocol functions:

    a)   A function that defines a method of mapping the IEEE 802.11 PSDUs into a framing format suitable for sending and receiving user data and management information between two or more STAs.

    b)   A function that defines the characteristics and method of transmitting and receiving data through a WM between two or more STAs, each using the OFDM system.

IEEE Std 802.11-2016 at 2277

130.    The accused products further include a coexistence module that performs coexistence arbitration between the Bluetooth and Wi-Fi radios.

https://www.nxp.com/products/wireless/wi-fi-plus-bluetooth/88w8987-2-4-5-ghz-dual-band-1x1-wi-fi-5-802-11ac-plus-bluetooth-5-1-solution:88W8987

## 4.4 Coexistence

• Internal coexistence arbitration for Wi-Fi/Bluetooth

https://www.nxp.com/docs/en/data-sheet/88W8987SDS.pdf

131.  On information and belief, when the Bluetooth radio discovers nearby devices or establishes a link with a Bluetooth device, the Wi-Fi radio module and/or the coexistence module in the accused products enters a learning phase to detect the Bluetooth traffic patterns describing Bluetooth traffic allocations.  The Wi-Fi radio module and/or the coexistence module then generate Wi-Fi traffic patterns according to the Bluetooth traffic patterns to coordinate operation of the Wi-Fi and Bluetooth radio modules.

132.  On information and belief, the Wi-Fi radio module in the accused products sends QoS Null packets with powersave mode or active mode indicated to an associated access point, which identifies to the access point the time slots when the access point may send OFDM sub-frames to the Wi-Fi radio.

133.    Defendants are not licensed or otherwise authorized to practice the claims of the '056 patent.

134.    By reason of Defendants' infringement, MediaTek has suffered substantial damages.

135.    MediaTek is entitled to recover the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

136.    MediaTek has complied with the requirements of 35 U.S.C. § 287(a) at least because MediaTek provided actual notice of its infringement allegation to Defendants through the filing of this complaint.

137.    MediaTek is informed and believes, and thereon alleges, that NXP actively, knowingly, and intentionally has induced infringement of the '056 patent by, for example, controlling the design and manufacture of, offering for sale, selling, supplying, and otherwise providing instruction and guidance regarding the above-described products with the knowledge and specific intent to encourage and facilitate infringing uses of such products by its customers both inside and outside the United States since NXP has knowledge of the '056 patent and its infringement of the '056 patent.  For example, NXP publicly provides documentation, including datasheets available through NXP's publicly accessible datasheets, instructing customers on uses of NXP's products that infringe the '056 patent.  *See, e.g.*, https://www.nxp.com/docs/en/data-sheet/88W8987SDS.pdf.    On information and belief, NXP's customers directly infringe the '056 patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products containing the above-described NXP products.

138.    MediaTek is informed and believes, and thereon alleges, that NXP has contributed to the infringement by its customers of the '056 Patent by, without authority, importing, selling and offering to sell within the United States materials and apparatuses for practicing the claimed invention of the '056 patent both inside

-64-

and outside the United States.  For example, the above described products constitute a material part of the inventions of the '056 patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use.    On information and belief, NXP knows that the above-described products constitute a material part of the inventions of the '056 patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use.    On information and belief, NXP's customers directly infringe the '056 patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products containing the above described NXP products.

139.  MediaTek is informed and believes, and thereon alleges, that Defendants' infringement of the '056 patent has been and continues to be willful. Defendants have had knowledge of the '056 patent and its infringement of the '056 patent at least since the service of this complaint.  Defendants have deliberately continued to infringe in a wanton, malicious, and egregious manner, with reckless disregard for MediaTek's patent rights.  Thus, Defendants' infringing actions have been and continue to be consciously wrongful.

140.  Defendants' infringement of the '056 patent is exceptional and entitles MediaTek to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT V

## Infringement of the '531 Patent

141.  MediaTek re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

142.  In violation of 35 U.S.C. § 271(a), Defendants have infringed the '531 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority, the aforementioned accused products which practice each

1   and every limitation of at least claim 1 of the '531 patent.  Defendants have infringed
2   literally and/or under the doctrine of equivalents.

3       143.   The accused products include a first radio module that performs wireless
4   transceiving in compliance with the Bluetooth protocol.



https://www.nxp.com/products/wireless/wi-fi-plus-bluetooth/88w8987-2-4-5-ghz-dual-band-1x1-wi-fi-5-802-11ac-plus-bluetooth-5-1-solution:88W8987

144.   On information and belief, the accused products operate in compliance with the Bluetooth 5 specification.



https://www.nxp.com/docs/en/data-sheet/88W8987SDS.pdf

145.   The Bluetooth radio in the accused products transmits and receives according to traffic patterns corresponding to a plurality of slots for Bluetooth transmitting and receiving operations.

COMPLAINT

### 2.2.3 Time slots

The basic piconet physical channel is divided into time slots, each 625 μs in length. The time slots are numbered according to the most significant 27 bits of the Bluetooth clock $CLK_{27-1}$ of the piconet master. The slot numbering ranges from 0 to $2^{27}$-1 and is cyclic with a cycle length of $2^{27}$. The time slot number is denoted as k.

A TDD scheme is used where master and slave alternately transmit, see Figure 2.1. The packet start shall be aligned with the slot start. Packets may extend over up to five time slots.



*Figure 2.1: Multi-slot packets*

Bluetooth Core Specification 5.2 at 421 https://www.nxp.com/docs/en/data-sheet/88W8987SDS.pdf

146. The accused products further include a second radio module that performs wireless transceiving in compliance with the IEEE 802.11 Wi-Fi protocol.

-67-

COMPLAINT



https://www.nxp.com/products/wireless/wi-fi-plus-bluetooth/88w8987-2-4-5-ghz-dual-band-1x1-wi-fi-5-802-11ac-plus-bluetooth-5-1-solution:88W8987

147.   On information and belief, the accused products operate in compliance with the 802.11ac and/or 802.11ax specification.

### 3  Wi-Fi subsystem

#### 3.1  IEEE 802.11 standards

- 802.11 data rates of 1 and 2 Mbit/s
- 802.11b data rates of 5.5 and 11 Mbit/s
- 802.11a/g data rates 6, 9, 12, 18, 24, 36, 48, and 54 Mbit/s for multimedia content transmission
- 802.11g/b performance enhancements
- 802.11ac / 802.11n with maximum data rates up to 86.7 Mbit/s (20 MHz channel), 200 Mbit/s (40 MHz channel), 433 Mbit/s (80 MHz channel)

https://www.nxp.com/docs/en/data-sheet/88W8987SDS.pdf

148.   The accused products further include a coexistence module that performs coexistence arbitration between the Bluetooth and Wi-Fi radios.

COMPLAINT



https://www.nxp.com/products/wireless/wi-fi-plus-bluetooth/88w8987-2-4-5-ghz-dual-band-1x1-wi-fi-5-802-11ac-plus-bluetooth-5-1-solution:88W8987

### 4.4  Coexistence

• Internal coexistence arbitration for Wi-Fi/Bluetooth

https://www.nxp.com/docs/en/data-sheet/88W8987SDS.pdf

149.   On information and belief, the Wi-Fi radio module and/or the coexistence module in the accused products determine a second set of traffic patterns corresponding to a plurality of slots for Wi-Fi transmitting and receiving operations. The Wi-Fi traffic patterns are determined based on the Bluetooth traffic patterns, such that the Wi-Fi radio will not transmit on time slots where the transmission would interfere with a Bluetooth receiving operation, and the Wi-Fi radio will not receive on time slots where a Bluetooth transmitting operation would interfere with Wi-Fi reception.

150.   On information and belief, the Wi-Fi radio module in the accused products sends QoS Null packets with powersave mode or active mode indicated to an associated access point to indicate to the access point the time slots when the

1 access point may perform transmitting and receiving operations with the Wi-Fi radio
2 module.

3    151.   Defendants are not licensed or otherwise authorized to practice the
4 claims of the '531 patent.

5    152.   By reason of Defendants' infringement, MediaTek has suffered
6 substantial damages.

7    153.   MediaTek is entitled to recover the damages sustained as a result of
8 Defendants' wrongful acts in an amount subject to proof at trial.

9    154.   MediaTek has complied with the requirements of 35 U.S.C. § 287(a) at
10 least because MediaTek provided actual notice of its infringement allegation to
11 Defendants through the filing of this complaint.

12    155.   MediaTek is informed and believes, and thereon alleges, that NXP
13 actively, knowingly, and intentionally has induced infringement of the '531 patent
14 by, for example, controlling the design and manufacture of, offering for sale, selling,
15 supplying, and otherwise providing instruction and guidance regarding the above-
16 described products with the knowledge and specific intent to encourage and facilitate
17 infringing uses of such products by its customers both inside and outside the United
18 States since NXP has knowledge of the '531 patent and its infringement of the '531
19 patent.   For example, NXP publicly provides documentation, including datasheets
20 available through NXP's publicly accessible datasheets, instructing customers on
21 uses   of   NXP's   products   that   infringe   the   '531   patent.   *See,   e.g.*,
22 https://www.nxp.com/docs/en/data-sheet/88W8987SDS.pdf.   On information and
23 belief, NXP's customers directly infringe the '531 patent by, for example, making,
24 using, offering to sell, and selling within the United States, and importing into the
25 United States, without authority or license, products containing the above-described
26 NXP products.

27    156.   MediaTek is informed and believes, and thereon alleges, that NXP has
28 contributed to the infringement by its customers of the '531 Patent by, without

authority, importing, selling and offering to sell within the United States materials and apparatuses for practicing the claimed invention of the '531 patent both inside and outside the United States. For example, the above described products constitute a material part of the inventions of the '531 patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use. On information and belief, NXP knows that the above-described products constitute a material part of the inventions of the '531 patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use. On information and belief, NXP's customers directly infringe the '531 patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products containing the above described NXP products.

157. MediaTek is informed and believes, and thereon alleges, that Defendants' infringement of the '531 patent has been and continues to be willful. Defendants have had knowledge of the '531 patent and its infringement of the '531 patent at least since the service of this complaint. Defendants have deliberately continued to infringe in a wanton, malicious, and egregious manner, with reckless disregard for MediaTek's patent rights. Thus, Defendants' infringing actions have been and continue to be consciously wrongful.

158. Defendants' infringement of the '531 patent is exceptional and entitles MediaTek to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT VI

### Infringement of the '948 Patent

159. MediaTek re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

160. In violation of 35 U.S.C. § 271(a), Defendants have infringed the '948 patent by making, using, selling, offering for sale, and/or importing into the United

States, without authority, the aforementioned accused products which practice each and every limitation of at least claim 11 of the '948 patent. Defendants have infringed literally and/or under the doctrine of equivalents.

161. Upon information and belief, the aforementioned accused products comply with the 802.11ax standard. In addition, the aforementioned accused products are implemented in a manner that not only complies with the 802.11ax standard, but also infringes the '948 patent. This is because implementations of 802.11ax that infringe the '948 patent are simpler and more efficient than implementations do not infringe the '948 patent.

162. The accused products include encoders that encode data packets that are transmitted from a source station to a destination over a resource unit in a wireless network.



**Figure 27-23—Timing boundaries for HE PPDU fields if midamble is not present**

IEEE P802.11ax/D6.0, November 2019, at 544

163. These encoders may use low density parity check (LDPC) encoding, as specified in the IEEE 802.11ax standard.



**Figure 27-18—Transmitter block diagram for the UL transmission or DL non-MU-MIMO transmission of a Data field with LDPC encoding on a 26-, 52-, 106-, 242-, 484- or 996-tone RU**

IEEE P802.11ax/D6.0, November 2019, at 526

164.    The products also include a capability to use dual sub-carrier modulation (DCM).

| FEATURES | 88W9064 |
|---|---|
| Wi-Fi® | • IEEE® 802.11ax, 802.11ac Wave 2, 802.11a/b/g/n<br>• 20/40/80/160 (80+80) MHz channel bandwidths<br>• 2.4 Gbit/s peak data rate<br>• Implicit and explicit beamforming |
| 802.11ax | • Downlink OFDMA and MU-MIMO<br>• Uplink OFDMA and MU-MIMO<br>• 1024 QAM<br>• Spatial re-use<br>• Range extension<br>• DCM |
| Flex MAC | • Adaptable architecture for standards evolution<br>• Management of high number of traffic queues<br>• Advanced scheduling |
| Bluetooth® | • Support for Bluetooth 5<br>• Direction finding<br>• Long range<br>• Co-existence arbitration |
| Dedicated In-Service Monitoring | • Concurrent spectrum scanning<br>• Zero wait DFS |
| Precision Location | • Distance: within 1 meter<br>• Angle: within 10 degrees |
| Host Interfaces | • MCi (2-Lane)<br>• PCIe® 3.0 (2-Lane)<br>• High-Speed UART (for Bluetooth only) |

https://www.nxp.com/docs/en/fact-sheet/88W9064-FACT-SHEET.pdf

165.  The products also include modulators that modulated the encoded bits. When DCM is enabled, these modulators modulate the encoded bits according to a first modulation scheme to produce a first set of modulated symbols, and modulate the same encoded bits using a second modulation scheme to produce a second set of modulated symbols.

## 27.3.12.9 Constellation mapping

If DCM is employed, bit sequences are mapped to a pair of symbols $(d_k, d_{q(k)})$ where $k$ is in the range of $0 \le k \le N_{SD} - 1$ and $q(k)$ is in the range of $N_{SD} \le q(k) \le 2N_{SD} - 1$ in order to exploit frequency diversity for a 996-tone or smaller RU, and $0 \le k \le N_{SD}/2 - 1$ and $q(k)$ is in the range of $N_{SD}/2 \le q(k) \le N_{SD} - 1$ for a 2×996-tone RU. To maximize the frequency diversity, the indices of a pair of DCM subcarriers $(k, q(k))$ is $q(k) = k + N_{SD}$ for a 996-tone or smaller RU and $q(k) = k + N_{SD}/2$ for a 2×996-tone RU. The $N_{SD}$ here refers to the $N_{SD}$ with DCM = 1, which is half the value of $N_{SD}$ with DCM = 0.

For BPSK modulation with DCM, the input stream is broken into groups of $N_{CBPS}$ or $N_{CBPS,u}$ bits $(B_0, B_1, ..., B_{N_{CBPS,u}-1})$. Each bit $B_k$ is BPSK modulated to a sample $d_k$. This generates the samples for the lower half of the data subcarriers. For the upper half of the subcarriers, the samples are generated as $d_{k+N_{SD}} = d_k \times e^{j(k+N_{SD})\pi}, k = 0, 1, ..., N_{SD} - 1$. The $N_{SD}$ here refers to the $N_{SD}$ with DCM = 1, which is half the value of $N_{SD}$ with DCM = 0.

IEEE P802.11ax/D6.0, November 2019, at 620-23.

166.  When DCM is enabled, and the encoded bits in the products were encoded using LDPC, the modulated symbols are mapped to the subcarriers of the resource unit using an LDPC tone mapper.  This tone mapper maps the first set of modulated symbols to the first half of frequency subcarriers in the resource unit, and maps the second set of modulated symbols to the second half of frequency subcarriers in the resource unit.

**27.3.12.10 LDPC tone mapper**

The LDPC tone mapping shall be performed on all LDPC encoded streams mapped in an RU as described in this subclause. LDPC tone mapping shall not be performed on streams that are encoded using BCC. If DCM is applied to LDPC encoded streams, $D_{TM\_DCM}$ shall be applied on both the lower half data subcarriers in an RU and the upper half data subcarriers of the RU. The LDPC tone mapping distance parameters $D_{TM}$ and $D_{TM\_DCM}$ are constant for each RU size and the values for different RU sizes are given in Table 27-36 (LDPC tone mapping distance for each RU size).

IEEE P802.11ax/D6.0, November 2019, at 623-24.

167.  Defendants are not licensed or otherwise authorized to practice the claims of the '948 patent.

-74-

168. By reason of Defendants' infringement, MediaTek has suffered substantial damages.

169. MediaTek is entitled to recover the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

170. MediaTek has complied with the requirements of 35 U.S.C. § 287(a) at least because MediaTek provided actual notice of its infringement allegation to Defendants through the filing of this complaint.

171. MediaTek is informed and believes, and thereon alleges, that NXP actively, knowingly, and intentionally has induced infringement of the '948 patent by, for example, controlling the design and manufacture of, offering for sale, selling, supplying, and otherwise providing instruction and guidance regarding the above-described products with the knowledge and specific intent to encourage and facilitate infringing uses of such products by its customers both inside and outside the United States since NXP has knowledge of the '948 patent and its infringement of the '948 patent.  For example, NXP publicly provides documentation, including datasheets available through NXP's publicly accessible datasheets, instructing customers on uses of NXP's products that infringe the '948 patent.  *See, e.g.*, https://www.nxp.com/docs/en/fact-sheet/88W9064-FACT-SHEET.pdf.    On information and belief, NXP's customers directly infringe the '948 patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products containing the above-described NXP products.

172. MediaTek is informed and believes, and thereon alleges, that NXP has contributed to the infringement by its customers of the '948 Patent by, without authority, importing, selling and offering to sell within the United States materials and apparatuses for practicing the claimed invention of the '948 patent both inside and outside the United States.  For example, the above described products constitute a material part of the inventions of the '948 patent and are not staple articles or

COMPLAINT

commodities of commerce suitable for substantial non-infringing use. On information and belief, NXP knows that the above-described products constitute a material part of the inventions of the '948 patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use. On information and belief, NXP's customers directly infringe the '948 patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products containing the above described NXP products.

173. MediaTek is informed and believes, and thereon alleges, that Defendants' infringement of the '948 patent has been and continues to be willful. Defendants have had knowledge of the '948 patent and its infringement of the '948 patent at least since the service of this complaint. Defendants have deliberately continued to infringe in a wanton, malicious, and egregious manner, with reckless disregard for MediaTek's patent rights. Thus, Defendants' infringing actions have been and continue to be consciously wrongful.

174. Defendants' infringement of the '948 patent is exceptional and entitles MediaTek to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

(a)  A judgment that corresponding Defendants have infringed each and every one of the Asserted Patents;

(b)  A judgment that corresponding Defendants' infringement of each and every one of the Asserted Patents is willful;

(c)     Damages   adequate   to   compensate   MediaTek   for   Defendants' infringement of the Asserted Patents pursuant to 35 U.S.C. § 284;

(d)     Pre-judgment interest;

(e)     Post-judgment interest;

(f)     A declaration that this action is exceptional pursuant to 35 U.S.C. § 285, and an award to MediaTek of its attorneys' fees, costs, and expenses incurred in connection with this action; and

(g)     Such other relief as the Court deems just and equitable.

DATED: June 17, 2021

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By   /s/ Kevin Johnson

Kevin P.B. Johnson
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:  (650) 801 5000
Facsimile:  (650) 801 5100
kevinjohnson@quinnemanuel.com

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Sean S. Pak
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700
seanpak@quinnemanuel.com

*Attorneys for Plaintiffs MediaTek Inc. and*
*MediaTek USA Inc.*

COMPLAINT

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38-1 of this Court, Plaintiffs hereby demand a trial by jury as to all issues so triable.

DATED: June 17, 2021                     Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By  */s/ Kevin Johnson*